**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

| | | |
|---|---|---|
| **MACY KIRKLAND**<br>**1901 William Howard Taft Rd.**<br>**Cincinnati, OH 45206,** | : <br> : | **CASE NO.  _____** |
| **Plaintiff,** | : | **JUDGE: _____** |
| **v.** | : | |
| **ENVIRONMENTAL LANDSCAPE,**<br>**LLC,**<br>**2723 Muir Station Rd.**<br>**Lexington, KY 40516** | : <br> : <br><br> : | **COMPLAINT** |
| **and** | : | |
| **ROBERT T. SANDERS,**<br>**424 W. Third Street**<br>**Lexington, KY 40508,** | : <br><br> : | |
| **Defendants.** | | |

Plaintiff Macy Kirkland ("Ms. Kirkland") states and avers the following as her

Complaint against Defendants Environmental Landscape, LLC ("ELL") and Robert T.

Sanders ("Mr. Sanders"):

<u>**THE PARTIES**</u>

1.     Ms. Kirkland owns a home at 1901 William Howard Taft Road in Cincinnati

(the "Kirkland Property"), where she resides part of the year.

2.     Ms. Kirkland is a Florida resident.

3.     The Kirkland Property is located in Hamilton County, Ohio and is the

subject matter of this litigation.

4.     ELL is a Kentucky limited liability company with its principal place of

business at 2723 Muir Station Road in Lexington, Kentucky.

5.      Mr. Sanders is an individual with his principal residence at 424 W. Third Street in Lexington, Kentucky, where he resides with his wife, Jennifer Braddock, who is the managing member of ELL.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) insofar as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

7.      This Court has personal jurisdiction over ELL and Mr. Sanders due to their maintenance of minimum contacts with the forum state, their general transaction of business in the forum state, their specific transaction of business with Ms. Kirkland in relation to landscaping services to be provided at and for the benefit of the Kirkland Property in the forum state, and their acts and omissions at the Kirkland Property that have damaged the Kirkland Property and Ms. Kirkland personally.

8.      This Court is the proper venue as the Kirkland Property is located in southwestern Ohio, the territory served by the Court.

## FACTUAL BACKGROUND

9.      Ms. Kirkland purchased the Kirkland Property for $2,700,000.00 in 2016.

10.     The Kirkland Property sits at the intersection of William Howard Taft Road and Columbia Parkway, on a hillside overlooking the Ohio River with unobstructed river views from the west side of the property where there are two levels of stone patios and overlooks, and from the northwest side of the property where there is a large in-ground pool.

11.     After purchasing the Kirkland Property, Ms. Kirkland began construction projects designed to transform the rear of the house, facing the river, into more of an outdoor entertaining and gathering area.

12.     Growing out of those construction projects, Ms. Kirkland began to desire a landscaping solution that would provide privacy for herself and any guests using the pool area, which was visible from the road and not buffered from the loud and frequent traffic up and down William Howard Taft at the intersection with Columbia Parkway.

13.     Similarly, she wished to create greater privacy between the Kirkland Property and the neighboring property to the northwest.

<u>Ms. Kirkland is Introduced to ELL and Mr. Sanders</u>

14.     In the fall of 2021, Ms. Kirkland's longtime property manager, Jeff Stwarska ("Mr. Stwarska"), introduced Ms. Kirkland to Mr. Sanders of ELL.

15.     Along with a friend, Randy Gunlock ("Mr. Gunlock"), they met with Mr. Sanders in Lexington to tour what Mr. Sanders represented to be ELL's large tree farm.

16.     After touring the farm, Mr. Sanders invited the group to his home to view his personal garden, including a hedge of pleached hornbeams that Ms. Kirkland had expressed interest in, as depicted in <u>Exhibit A</u>.

17.     While Ms. Kirkland was interested in larger hornbeam specimens, she very much liked the pleached and pruned appearance of the hornbeams in Mr. Sanders' garden and grew more enthusiastic about the prospect of working with ELL and Mr. Sanders to create a similar look at her home and achieve the privacy she desired.

18.     Following this meeting, Mr. Sanders visited the Kirkland Property in early October of 2021 to share suggestions for planting large tree specimens and other

3

landscaping that he claimed could provide the privacy Ms. Kirkland desired from the road and the neighboring property and heighten the overall aesthetic beauty of the Kirkland Property.

<u>ELL Makes Formal Proposals for Two Phases of Landscaping Work</u>

19.     These conversations led to a rendering or illustration attached hereto as <u>Exhibit B</u>, supported by a proposal from ELL on October 5, 2021 as to a Phase 1 scope of work (the "Phase 1 Landscaping Proposal") and a Phase 2 scope of work (the "Phase 2 Landscaping Proposal") at the Kirkland Property.

20.     A true and accurate copy of the Phase 1 Landscaping Proposal is attached hereto as <u>Exhibit C</u>.

21.     The purpose of the Phase 1 Landscaping Proposal was to provide privacy and a buffer for the poolside area from the traffic and noise of the busy intersection.

22.     A true and accurate copy of the Phase 2 Landscaping Proposal is attached hereto as <u>Exhibit D</u>.

23.     The purpose of the Phase 2 Landscaping Proposal was to provide privacy between the Kirkland Property and the neighboring property to the northwest.

<u>Pricing and Billing Terms for the Landscaping Proposals</u>

24.     Both the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal quoted prices for trees fully inclusive of all removal/relocation from the source farm, transportation from Lexington to Cincinnati, soil preparation (other than soil fracturing), planting with ELL's tree spade, and tending all trees through the completion of the work.

25.    Notably, because ELL quoted an all-inclusive price, the per-tree price was five to ten times as expensive as the price for a mature specimen alone (including two European copper weeping beeches intended for either side of the pool equipment house quoted at a staggering $47,500.00 per tree as part of Phase 1).

26.    The parties discussed the concept of all-inclusive pricing in detail. Mr. Sanders even discussed all-inclusive pricing during a dinner conversation at the Kirkland Property in the presence of multiple witnesses, including Ms. Kirkland's friend Mr. Gunlock, who was also interested in engaging and eventually did engage ELL to plant trees on his farm in Dayton, Ohio.

27.    In fact, Mr. Sanders assured Ms. Kirkland that in addition to preparing, planting, pruning, pleaching and irrigating the trees, he would be acting as the "nurse-maid" for the trees because he thought of them as "his babies."

28.    This appealed to Ms. Kirkland because it suggested that her investment would be well cared for, even in her absence, by professionals who valued and understood what it would take to realize her vision.

29.    Due to the all-inclusive pricing, the total cost of the Phase 1 Landscaping Proposal, $463,400.00, was the full and final cost for that phase subject only to change based on the quantity of trees actually planted, any unforeseen challenges or obstacles encountered, and the need to outsource a portion of the work to third-party subcontractors.

30.    Likewise, the $421,675.00 total cost of the Phase 2 Landscaping Proposal was the full and final cost for that phase subject to the same conditions as in Phase 1.

31.     In an October 6, 2021 cover letter that accompanied the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal, ELL outlined how it would handle unforeseen obstacles or the need to engage third parties to complete portions of the work.

32.     A true and accurate copy of this cover letter is attached hereto as <u>Exhibit E</u>.

33.     In that letter, Mr. Sanders stated that because "implementation of a job like this can run into unforeseen obstacles underground and drainage challenges, [ELL has] enclosed a time and materials rate sheet."

34.     ELL did not, in fact, enclose a time and materials rate sheet.

35.     Further demonstrating that these time and materials charges were only for unforeseen challenges, Mr. Sanders promised that whenever such challenges were encountered and ELL would need to "default to a [time and materials approach]," they would consult with Mr. Stwarska and "keep track with a daily worksheet/log for approval."

36.     Additionally, Mr. Sanders conveyed that only when the work required outside subcontractors would ELL invoice Ms. Kirkland at a cost plus 25% rate.

37.     Thus, the agreement between ELL and Ms. Kirkland provided that Ms. Kirkland would be billed: (1) the stated unit cost of the trees multiplied by how many trees were planted (with no charges for any services incidental to planting and maintaining the trees); (2) only those additional time and material charges that were submitted and approved on a daily basis due to unforeseen challenges or obstacles;

and (3) subcontractor cost-plus 25% charges only when subcontractors were needed to complete portions of the work.

38.     Given that, and reassured that the costs were well-contained, Ms. Kirkland agreed to the terms of the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal, though she did not sign the documents provided by Mr. Sanders.

<u>Ms. Kirkland Leaves for Florida</u>

39.     On October 11, 2021, Ms. Kirkland left the Kirkland Property for Boca Grande, Florida.

40.     Ms. Kirkland communicated to Mr. Sanders her intention to remain in Florida through early May 2022, and her desire to have all work under both the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal fully completed at the time of her return so she could enjoy the pool in privacy during pool season.

41.     Mr. Sanders emphatically promised that all work under both proposals would be complete by May 1, 2022.

42.     With the bulk of the work needing to take place in less temperate weather, Ms. Kirkland volunteered to pay for an all-weather tent or covering to ensure timely completion.

43.     In response, Mr. Sanders said that if they needed a tent, he knew all the big tent companies and referenced his work at Keeneland, which further reassured Ms. Kirkland that Mr. Sanders knew how to get a job completed despite adverse weather conditions.

44.     Thus, Ms. Kirkland expected there to be little to no reason that Mr. Sanders and ELL could not spend whatever time they needed to at the Kirkland Property working diligently to timely finish the Phase 1 Landscaping Proposal and Phase 2 Landscaping Proposal.

<u>Rather than Nurse the Trees Planted in Phase 1, ELL Neglects Them</u>

45.     Initial returns on the completion of the Phase 1 Landscaping Proposal were promising, with a flurry of planting activity in October and early November of 2021.

46.     Shortly after Ms. Kirkland left, ELL transported hornbeams contemplated in the Phase 1 Landscaping Proposal to the Kirkland Property.

47.     The hornbeams appear on the first page of the illustration attached as Exhibit B as rectangular columns that form a wall of privacy on the northeast side of the swimming pool closest to the road and farthest from the river.

48.     While many of the hornbeams were planted, several were left unplanted, leaning on their sides still attached to their root balls, which were fully exposed and not watered other than by natural rainwater.

49.     The hornbeams that ELL had not planted remained unplanted for more than six months while Ms. Kirkland was in Florida.

50.     The remaining hornbeams were neither pruned nor pleached and do not resemble in the slightest those in the illustration attached as Exhibit B or shown in the photographs taken at Mr. Sanders' home attached as Exhibit A.

51.     Dated photographs documenting the condition of the hornbeams are attached as <u>Exhibit F</u>, with the last photo documenting their current condition and the absence of pleaching and pruning as required by the Phase 1 Landscaping Proposal.

8

52.     In addition to hornbeams, the Phase 1 Landscaping Proposal called for the provision of 15 large (22') red cedars, which are shown on the first page of the illustration attached as Exhibit B as triangular protrusions to the east of the hornbeams and behind a planned conservatory and were intended to resemble an even line of sentinels.

53.     The planting of the cedars was to have proceeded according to ELL's specification of the soil preparation and with appropriate backfill.

54.     ELL planted the cedars in October and November of 2021, but did not appropriately support them, and many sank and needed to be re-set or even re-planted in the following months, with the result being a row that more resembles the broken teeth of a jack-o-lantern than a straight string of sentinels.

55.     Compounding matters, ELL failed to maintain and irrigate the cedars, having done nothing on the latter front until May 2022, leading at least 10 cedars to have brown, desiccated insides, with only a feeble showing of green growth on the outer branches.

56.     Dated photographs documenting the condition of the red cedars, including the lack of appropriate backfill and soil support, are attached as Exhibit G, with the last photo documenting their current condition.

57.     ELL planted the $95,000.00 weeping beeches on or around November 10, 2021.

58.     The weeping beeches are shown on the illustration attached as Exhibit B as two shaggy gumdrop-shaped trees on either side of the pool equipment house at the far end of the swimming pool.

59.     Photographs of what Mr. Sanders promised the weeping beeches would look like are attached hereto as Exhibit H.

60.     Instead of being an eye-catching statement, the weeping beeches are an eyesore.

61.     Photographs of what they actually look like with broken branches, scaled leaves, and sparse growth are attached hereto as Exhibit I.

62.     Finally, the Phase 1 Landscaping Proposal called for the provision of 300 "green ice" boxwoods for a total price of $52,500.00.

63.     Instead of supplying these boxwoods, ELL unilaterally and without approval relocated and used less appealing boxwoods from elsewhere on the Kirkland Property (and, in fact, did not transplant Ms. Kirkland's own boxwoods until the end of May 2022).

## ELL Makes a Proposal to Supply Groundcover

64.     On November 1, 2021, ELL proposed to supply groundcover to the area between the pool and the retaining wall on the side of the Kirkland Property nearest the river (the "Groundcover Proposal").

65.     A true and accurate copy of the Groundcover Proposal is attached as Exhibit J.

66.     The cost of the Groundcover Proposal was $12,837.50.

67.     Mr. Sanders subsequently told Ms. Kirkland that he was mistaken and that it would be more expensive (and later attempted to invoice at the higher price), but Ms. Kirkland told him – and Mr. Sanders agreed – that this was his mistake and the quoted price was the price that she would pay.

68.    Ms. Kirkland accepted the Groundcover Proposal without signing the document Mr. Sanders provided.

69.    ELL quoted soil fracturing for this area to remediate soil compaction.

70.    This area did not require soil fracturing, as Ms. Kirkland had it fractured the year prior for the placement of sod, but the areas around the trees, especially those behind the pool equipment house, very clearly did require soil fracturing.

71.    Mr. Sanders supplied a video to Ms. Kirkland showing soil fracturing in the groundcover area, but never provided Ms. Kirkland any evidence that soil fracturing occurred in connection with the planting of any trees.

72.    Upon information and belief, soil fracturing did not occur in connection with the planting of any trees that were part of the Phase 1 Landscaping Proposal or the Phase 2 Landscaping Proposal.

73.    Mr. Sanders showed Ms. Kirkland examples of what the groundcover would look like when it was planted, and Ms. Kirkland approved because she was interested in having complete coverage and not interested in seeing any mulch in that area.

74.    A true and accurate copy of the photograph ELL provided showing an example of complete coverage is attached hereto as Exhibit K.

75.    ELL actually attempted to plant the groundcover twice. The first time ELL planted the groundcover, it was not satisfied with the appearance and ripped it out in its entirety.

76.    ELL then attempted to plant the exact same groundcover with equally disastrous results.

77.     Photographs depicting the scorched, wispy and threadbare final appearance of the groundcover are attached hereto as <u>Exhibit L</u>.

<u>Mr. Sanders Drives Mr. Stwarska Away, Then Takes Over</u>

78.     While ELL was engaged in its Phase I Landscaping Proposal work in October and November of 2021, and making new proposals to sell Ms. Kirkland more trees and groundcover, Mr. Stwarska was doing and supervising various construction related tasks at the Kirkland Property.

79.     These tasks included building a retaining wall between the road and the row of cedars planted by ELL and managing various masonry projects related to stone needed in and around the pool and fountain.

80.     By this point, Mr. Sanders had built up a level of familiarity and trust with Ms. Kirkland, who was now in Florida, ingratiating himself to her in a number of text messages and working to foster confidence in himself while contributing to a growing lack of confidence in Mr. Stwarska.

81.     An example of this ingratiating behavior appears in the text message from Mr. Sanders to Ms. Kirkland in January 2022 that is attached as <u>Exhibit M</u>.

82.     For self-serving reasons, Mr. Sanders ultimately sought to drive a wedge between Ms. Kirkland and Mr. Stwarska that would lead to Mr. Stwarska's removal from the Kirkland Property, thereby depriving Mr. Stwarska of the ability to see just how much the ELL crew was (or was not) completing and with what level of care and professionalism.

83.     Mr. Sanders brought his mason, a man named Frank Dyer, to the site in late January to meet with Mr. Stwarska and go over a list of outstanding work.

84. When Mr. Sanders finished pumping Mr. Stwarska for information that would allow him to better understand the scope of the masonry work, he took that information and made a pitch to take over management of all of the masonry and outdoor construction projects that remained.

85. In doing so, Mr. Sanders presented himself as someone with the ability and appropriate licensure to serve as a general construction contractor and provide management services outside the tree planting and maintenance area.

86. Mr. Sanders formalized this pitch on January 26, 2022 in a document entitled "Cincinnati job Phase 1," a true and accurate copy of which is attached hereto as Exhibit N (the "Masonry Proposal").

87. Mr. Sanders presented the Masonry Proposal not on ELL letterhead, and mentioned to Ms. Kirkland that he was going through a divorce with the other owner of the ELL business, Ms. Braddock, and that he might want certain payments delayed for reasons he did not fully explain to Ms. Kirkland.

88. Additionally, there were no terms and conditions supplied with or made a part of the Masonry Proposal as there were with the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal.

### The Masonry Proposal

89. For a price of $73,875.00, exclusive of coping work needed for the El Paso Wall shown on page 3 of Exhibit B, ELL agreed to oversee completion of a bullet-point list that comprised all of the significant remaining outdoor construction projects.

90. This gave ELL total control of and responsibility for not just the scope of work under the Phase 1 Landscaping Proposal, the Phase 2 Landscaping Proposal,

13

and the Groundcover Proposal, but all of the cosmetic and structural/foundational masonry work in and around the pool area.

91.     Additionally, as items outside the scope of the Masonry Proposal came up here and there, Mr. Sanders would approach Ms. Kirkland and offer to take care of them or have his mason take care of them, but never made proposals or quoted pricing for these items.

### With Mr. Stwarska Away, ELL Begins to Delay

92.     In February 2022, with just three months until Ms. Kirkland's return from Florida, ELL had cleared Mr. Stwarska from the site, and had many significant tasks in front of it.

93.     Specifically, ELL still needed to perform maintenance on trees planted under the Phase 1 Landscaping Proposal and complete the planting of several hornbeams.

94.     At this time, ELL further needed to begin the Phase 2 Landscaping Proposal with the entire scope of work to build privacy between Ms. Kirkland and her neighbor being outstanding.

95.     Further, ELL still had not completed the Groundcover Proposal to anyone's satisfaction.

96.     Finally, ELL needed to begin work under the Masonry Proposal.

97.     Beginning in February 2022, though, Ms. Kirkland began to notice that ELL and Mr. Sanders were increasingly unavailable and trotted out excuse after excuse for why they were not at the Kirkland Property or did not complete certain tasks as promised or expected.

98. Examples of these messages are attached as <u>Exhibit O</u>.

99. Frustratingly, these included claims that inclement weather prevented the work, even though Ms. Kirkland had previously offered to provide a tent.

<u>Ms. Kirkland Discovers the Excuses are Lies, and Threatens Termination</u>

100. These issues came to a head at the end of April 2022, when Ms. Kirkland discovered – after a litany of excuses about Mr. Sanders' poor health and the weather – that Mr. Sanders had secretly pulled his team from the Kirkland Property to do work at Mr. Gunlock's Dayton farm.

101. Mr. Sanders had done this even after promising to Ms. Kirkland that he would prioritize her work to meet her May 1, 2022 deadline, a promise he reiterated in January 2022 to secure the Masonry Proposal.

102. The text message exchange documenting this revelation and the fallout is attached as <u>Exhibit P</u>.

103. Mr. Sanders apologized profusely and asked for another chance, and after a long call with Ms. Kirkland wherein he professed his commitment to fully performing his and ELL's contractual obligations, she agreed to allow ELL to continue working on the Kirkland Property.

104. In a continuing effort to take advantage of the situation, Mr. Sanders thereafter refused to proceed unless and until Ms. Kirkland paid ELL a claimed outstanding balance of $353,484.21.

105. This amount included work that was grossly overcharged and duplicative and that failed to follow the pricing and billing terms of the agreement between ELL and Ms. Kirkland.

106.    For example, ELL charged Ms. Kirkland more than 730 hours of foreman and laborer time, none of which was ever submitted to or approved by Mr. Stwarska as required, much less on a daily basis, and most or all of which would have related to the Phase I Landscaping Proposal which was all-inclusive.

107.    The amount also included costs for trees and groundcover that ELL never supplied, and red cedars that were dead and that ELL eventually removed.

108.    Mr. Sanders subsequently acknowledged the invoice was confusing and possibly incorrect and needed to be reconciled. That admission is attached hereto as Exhibit Q.

109.    Nevertheless, before that admission and at the proverbial point of a gun, Ms. Kirkland authorized her domestic manager Emily to make the $353,484.21 payment on April 29, 2022 hoping that it would cause ELL to finish the work quickly and allow her to return home to a completed property, with this nightmare behind her.

110.    The photographs she received from Emily on May 10, 2022, however, proved conclusively that the Kirkland Property was far from complete.

111.    True and accurate copies of those photographs are attached as Exhibit R.

112.    As a result of the photographs and the fact that the pool area was not even close to being ready for use of the pool, much less private use, Ms. Kirkland delayed her return home by one month to give ELL extra time to finish everything.

<u>Ms. Kirkland Returns Home to Chaos</u>

113.    Despite this additional time, on June 9, 2022, Ms. Kirkland was dismayed when she returned home and saw the condition of the Kirkland Property.

114. The Phase 1 Landscaping Proposal work was in need of substantial tree remediation as documented in paragraphs 45 through 63 above.

115. The Phase 2 Landscaping Proposal "work" had only involved tree removal, putting in a construction access road, planting the dead cedars behind the pool equipment house, and not supplying any of the remaining trees contemplated by Phase 2, resulting in less privacy on the property line than there was before ELL began working.

116. The groundcover for the Groundcover Proposal did not come close to covering the area it was to cover, and instead of no mulch showing, it was almost all mulch.

117. Finally, the Masonry Proposal work was nowhere near complete, with mud and dirt where there was supposed to be turf and stone.

118. Worse yet, the mason Mr. Sanders engaged, Frank Dyer, had defectively installed the coping on the steps near the fountain between the patio and the pool area, and ELL and/or Mr. Dyer had further damaged the steps after installation.

119. Specifically, the steps showed broken areas, concrete spatters, treads that were not properly adhered, and – most significantly – an incline back toward the base of each step rather than a slight forward slant, which would lead water to pool on the steps causing an electrical hazard with the sockets for the lighting on the steps and fountain.

120. Photographs depicting the issues with the steps are attached hereto as Exhibit S.

121.   Finally, there was construction debris and trash strewn all over the Kirkland Property, which had been an issue throughout ELL's work at the Kirkland Property as shown in the photographs attached as <u>Exhibit T</u>.

122.   Photographs depicting the condition of the Kirkland Property on June 9-10, 2022 are attached hereto as <u>Exhibit U</u>.

123.   Ms. Kirkland texted Mr. Sanders on June 10, 2022 to express her frustrations, as documented in the message attached hereto as <u>Exhibit V</u>.

124.   Mr. Sanders responded, promising that the most immediate pool-related issue (the absence of turf) would be fixed within the next week, and asking permission to work the next two days, June 11-12, 2022, to get the site in better shape.

125.   Ms. Kirkland responded that she would expect ELL to work both days.

126.   Text messages reflecting this conversation are attached hereto as <u>Exhibit W</u>.

127.   Mr. Sanders and his crew were not there on June 11, 2022 claiming that it rained.

128.   While there were overcast skies at the Kirkland Property, it did not rain there on June 11, 2022.

129.   The text message exchange on this issue is attached as <u>Exhibit X</u>.

130.   Needless to say, Ms. Kirkland was furious that the weather was once again used as an excuse when – in reality – the weather was no issue.

131.   Compounding matters, Mr. Sanders had not arranged for the turf installers to be at the Kirkland Property by June 17, 2022 as promised.

132. Ms. Kirkland attempted to manage Mr. Sanders and the ELL crew through June 24, when she sent the text message and follow-up email attached as Exhibit Y.

133. Mr. Sanders avoided responding substantively to the email and his communications became irregular and garbled.

134. As a result, Ms. Kirkland engaged counsel and sent a letter on July 6, 2022, a true and accurate copy of which is attached as Exhibit Z.

135. After exchanging multiple proposals, Ms. Kirkland and ELL could not reach an agreement on the performance of the unfinished (and, in some cases, not even commenced) work.

136. Accordingly, Ms. Kirkland has been left in the position of needing to engage outside contractors to finish work that she has paid (and overpaid) ELL to complete.

**<u>FIRST CLAIM FOR RELIEF</u>**
**(BREACH OF CONTRACT: PHASE 1 LANDSCAPING PROPOSAL)**

137. Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

138. The Phase 1 Landscaping Proposal was accepted by Ms. Kirkland and constitutes a valid and enforceable contract between ELL and Ms. Kirkland.

139. Under the Phase 1 Landscaping Proposal, ELL agreed to provide all-inclusive transportation, planting, and care for the trees listed in the Phase 1 Landscaping Proposal.

140. Despite ELL's promise to see the planting through to completion and provide trees that matched the illustration attached hereto as Exhibit B and photographs supplied by Mr. Sanders and ELL, each tree variety falls egregiously short.

19

141. This shortfall is not due to defects intrinsic to the trees themselves, but rather defects, sloppiness and delay in the work of ELL.

142. Specifically, the hornbeams are uneven, planted at different height levels, have not been pleached or pruned, and do not form an unbroken, almost geometric barrier as shown in the illustration.

143. The red cedars were to be in a straight line at even height and a solid green in color.

144. Instead, due to mistakes by ELL in their planting and failure to appropriately monitor and care for the trees through completion of the work, the cedars are jagged and staggered, and at least 10 of the 15 cedars are dead or dying, their inside limbs having turned dry and brown.

145. The weeping beeches – at a cost of $47,500.00 per tree – were expected to be full and provide a substantial barrier and focal point on either side of the pool equipment house.

146. Instead, they are sparse and straggly and appear diseased, and have numerous broken branches of significant size removed all the way back to the trunk of the trees.

147. Moreover, as stated above, ELL unilaterally and without approval relocated and used boxwoods from elsewhere on the Kirkland Property without replacing the boxwoods it converted.

148. As a result of ELL's failure to deliver trees in any way resembling the illustration and photographs provided by ELL, Ms. Kirkland has been damaged by needing removal or replacement of the dead or dying (and in the case of the boxwoods,

replacement of the converted) trees and emergency evaluation and maintenance by an arborist to determine if the remaining trees can be salvaged and brought into conformity with the promised appearance of the landscaping.

149.   Those damages will be determined at trial, but far exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

### <u>SECOND CLAIM FOR RELIEF</u>
### (BREACH OF CONTRACT: PHASE 2 LANDSCAPING PROPOSAL)

150.   Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

151.   The Phase 2 Landscaping Proposal was accepted by Ms. Kirkland and constitutes a valid and enforceable contract between ELL and Ms. Kirkland.

152.   The Phase 2 Landscaping Proposal was quoted in October of 2021 at the same time as the Phase 1 Landscaping Proposal.

153.   Both were promised a completion date of May 1, 2022 by ELL.

154.   While the Phase 1 Landscaping Proposal saw significant work undertaken by ELL, the Phase 2 Landscaping Proposal work actually damaged the Kirkland Property and left it in a worse condition than it was in originally.

155.   In preparation for the Phase 2 Landscaping Proposal work to begin, ELL removed healthy trees on the property line between the Kirkland Property and the neighboring property.

156.   These trees were either not replaced at all, or were replaced with cedars that promptly died and needed to be (and were) removed by ELL.

157.   Given the muddled nature of ELL's invoices, it is difficult to determine the nature of any work in the Phase 2 Landscaping Proposal that ELL has billed Ms.

Kirkland, but the result of ELL's work has been less privacy on the property line, not more privacy as Ms. Kirkland sought.

158.    As a result of ELL's failure to perform the Phase 2 Landscaping Proposal work to completion, Ms. Kirkland has been damaged in an amount to be determined at trial but anticipated to exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

**THIRD CLAIM FOR RELIEF**
**(BREACH OF CONTRACT: GROUNDCOVER PROPOSAL)**

159.    Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

160.    The Groundcover Proposal was accepted by Ms. Kirkland and constitutes a valid and enforceable contract between ELL and Ms. Kirkland.

161.    Ms. Kirkland was promised groundcover that would, in fact, fully cover the ground in an aesthetically appealing way.

162.    Instead, she received wispy, incomplete, dry and burned out groundcover that detracts from the appearance of the Kirkland Property.

163.    As a result of the breach of the Groundcover Proposal, Ms. Kirkland has been damaged in an amount to be determined at trial, but expected to exceed the value of the Groundcover Proposal and – along with the other claims in this Complaint – well exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

**FOURTH CLAIM FOR RELIEF**
**(BREACH OF CONTRACT: MASONRY PROPOSAL)**

164.    Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

22

165. The Masonry Proposal was accepted by Ms. Kirkland and constitutes a valid and enforceable contract.

166. Central to the Masonry Proposal was completion of walls, coping, placement of large stepping stones near the pool around which there would be turf and general completion of the remaining outdoor construction projects taken over from Mr. Stwarska.

167. Like the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal, the Masonry Proposal was promised a completion date of May 1, 2022.

168. On June 9, 2022, when Ms. Kirkland returned to the Kirkland Property, the Masonry Proposal was far from complete as documented in Exhibit P.

169. Ms. Kirkland eventually had to take over management and see the installation of turf and stone placement through to completion herself.

170. Significant coping and finishing tasks remain incomplete under the Masonry Proposal.

171. Additionally, the masonry work on the steps between the patio and the pool near the fountain requires complete replacement due to defects in installation and damage to the steps.

172. Between overpayments for the work in the Masonry Proposal and the cost of hiring outside contractors to fix and complete work in the Masonry Proposal, Ms. Kirkland has been damaged in an amount to be determined at trial, but anticipated to exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

## FIFTH CLAIM FOR RELIEF
### (BREACH OF CONTRACT: BILLING IMPROPRIETIES)

173. Ms. Kirkland incorporates the foregoing allegations as if fully restated

23

herein.

174.    The combined cost of all proposals supplied by ELL and/or Mr. Sanders, including the Phase 1 Landscaping Proposal, the Phase 2 Landscaping Proposal, the Groundcover Proposal and the Masonry Proposal – was $971,787.50, not including additional work agreed to orally in the Masonry Proposal and never formally quoted by Mr. Sanders or ELL.

175.    Especially as it pertains to the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal, which form more than 90 percent of the total price of the work, the quoted prices were intended to be an all-inclusive price for planting and care of trees through to completion of the work and turning over the finished project to Ms. Kirkland.

176.    ELL contracted to perform the work at that fixed price, with the only exceptions being when: (1) when more or fewer trees were actually used; (2) ELL encountered unforeseen circumstances or challenges that required time and materials billing after daily submission of time entries and logs and approval by Mr. Stwarska; or (3) when outside contractors were used, and ELL would bill on a cost-plus 25% basis.

177.    True and accurate copies of invoices and account statements supplied by ELL are attached hereto as Exhibit AA.

178.    ELL never submitted a single time entry or log for prior approval by Mr. Stwarska or Ms. Kirkland, and certainly did not do so on a daily basis.

179.    Nor does Ms. Kirkland have a copy of or ever recall seeing a time and materials hourly rate sheet for Mr. Sanders or any of ELL's employees.

24

180. Nevertheless, ELL billed and demanded that Ms. Kirkland pay for time and materials charges for more than 730 hours at rates of $75.00/hour for the foreman and $48.50/hour for the laborers.

181. Additionally, Mr. Sanders billed 55.25 hours of his own time at a rate of $175.00 per hour, also without submission to or approval by Mr. Stwarska or Ms Kirkland.

182. After counsel for Ms. Kirkland sent the letter attached as Exhibit U, ELL attempted to send final, up-to-date invoices dated July 8, 2022 seeking to pass along more than 1000 hours of foreman and laborer time as well as numerous materials charges.

183. The Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal did not allow for time and materials billing unless there were unforeseen challenges and then only if the billing was submitted daily for approval.

184. There were no unforeseen challenges that would have allowed time and materials billing.

185. There was never any submission of time and materials charges to Mr. Stwarska or Ms. Kirkland for approval.

186. Further, the Groundcover Proposal and the Masonry Proposal did not have any time and materials component or language whatsoever, but quoted a price that was inclusive of labor and equipment rental.

187. Nevertheless, ELL presented new invoices dated July 8, 2022, seeking an additional $211,264.98, despite the Phase 1 Landscaping Proposal work requiring significant remediation, the Phase 2 Landscaping Proposal not having been

meaningfully commenced in any way, the Groundcover Proposal work actually worsening the appearance of the Kirkland Property, and the Masonry Proposal work being abandoned before completion (and with defects that will need to be fixed).

188.    Mr. Sanders has acknowledged that ELL's billing is difficult to understand and in need of being redone.

189.    More than that, the billing by ELL does not follow the terms of any of the parties' agreements and has resulted in significant overcharges to and overpayments by Ms. Kirkland.

190.    Discovery will be required to determine whether any time and materials charges or outside contractor fees and management fees are sustainable in any fashion, but the amount of overpayments by Ms. Kirkland is expected to well exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

## SIXTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

191.    Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

192.    To the extent any of the parties' agreements are found to be quasi-contractual or non-contractual, Ms. Kirkland has conferred a substantial benefit on ELL through her payment of approximately $600,000.00 for work that has been substandard, delayed, not completed, and not beneficial to the Kirkland Property.

193.    It would be unjust to permit ELL to retain the benefit of Ms. Kirkland's payments without reimbursing Ms. Kirkland the difference between the value of the work actually performed and provided and what Ms. Kirkland has paid.

194.    That amount is not known at this time, but will be determined at trial and is anticipated to exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

**SEVENTH CLAIM FOR RELIEF**
**(PROFESSIONAL NEGLIGENCE)**

195.    Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

196.    ELL and Mr. Sanders owed a duty of care to Ms. Kirkland to perform the services under the Phase 1 Landscaping Proposal, the Phase 2 Landscaping Proposal, the Groundcover Proposal and the Masonry Proposal to the level of care reasonably expected of a professional in the landscaping and general contracting industries and at a workmanlike pace and quality.

197.    ELL breached that duty of care through, among other failings, its deficient planting and maintenance of the trees provided under the Phase 1 Landscaping Proposal.

198.    ELL breached that duty of care through, among other failings, its nonperformance of the work in the Phase 2 Landscaping Proposal and its removal of privacy barriers without replacing them as contemplated.

199.    ELL and Mr. Sanders breached that duty of care through, among other failings, their utter failure to supply groundcover of the type, coverage and appearance they promised to provide Ms. Kirkland pursuant to the Groundcover Proposal.

200.    ELL and Mr. Sanders breached that duty of care through, among other failings, their incomplete and deficient work under the Masonry Proposal.

201. ELL and Mr. Sanders breached that duty of care through their delay and failure to execute the work in a workmanlike fashion, that ultimately led to their failure to deliver completed projects in the timeline promised to Ms. Kirkland.

202. These breaches caused Ms. Kirkland damage in an amount to be determined at trial, but anticipated to exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

## EIGHTH CLAIM FOR RELIEF
### (FRAUDULENT INDUCEMENT BY MR. SANDERS)

203. Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

204. In order to secure the Masonry Proposal, Mr. Sanders represented that he could act as a general contractor for masonry and construction projects in Ohio.

205. Mr. Sanders conveyed to Ms. Kirkland that he had the requisite experience and wherewithal to secure the required permits, to coordinate the work of various utilities and contractors in compliance with state and local laws, and to see the work under the Masonry Proposal through to timely completion on May 1, 2022.

206. Mr. Sanders conveyed to Ms. Kirkland that he wanted the Masonry Proposal work and the back-end payment for the work to fly under the radar because he was divorcing the other owner of ELL, Ms. Braddock, and that would be better for him.

207. Upon information and belief, Mr. Sanders actually sought to conceal that he was engaging in the Masonry Proposal because it was far outside Mr. Sanders' actual experience or ability, and he lacked the requisite licensure to serve as a general contractor in this manner.

208.    Instead of being truthful with Ms. Kirkland about his background and experience and running this work through a proposal like he had done with the Phase 1 Landscaping Proposal and the Phase 2 Landscaping Proposal, Mr. Sanders wrote this proposal as a bullet-point side document that he sent to Ms. Kirkland via text message.

209.    Further, as the project continued, Mr. Sanders took on additional scope of work for gas lines, conduits and turf without any documentation whatsoever, on ELL's letterhead or otherwise.

210.    Again, upon information and belief, this "off the books" approach was chosen by Mr. Sanders to conceal from Ms. Kirkland (and Mr. Sanders' wife and business partner, Ms. Braddock) that ELL and Mr. Sanders had bitten off far more than they could chew and were acting well outside their expertise and without appropriate licensure.

211.    In entering the Masonry Proposal and adding projects to the scope of work, at all times Ms. Kirkland trusted that Mr. Sanders was as he represented himself to be, someone experienced, licensed and capable of providing general contracting services on a multifaceted construction project.

212.    Instead, upon information and belief, Mr. Sanders lacked those qualifications and was woefully inadequate at coordinating and completing the work he promised to perform.

213.    Neither Mr. Sanders nor ELL is a licensed contractor in Cincinnati or Ohio.

214.    Had Ms. Kirkland known Mr. Sanders' true experience level, she never would have dismissed Mr. Stwarska and engaged Mr. Sanders under the Masonry Proposal.

215.    Mr. Sanders acted outside the scope of his employment relationship with ELL in securing the Masonry Proposal and subsequent additional work as orally agreed.

216.    Having acted outside the scope of his employment, Mr. Sanders is personally liable for his false and fraudulent misrepresentations that induced Ms. Kirkland to enter into the Masonry Proposal.

217.    As a result of Mr. Sanders' false and fraudulent misrepresentation of his qualifications and licensure that induced Ms. Kirkland to enter the Masonry Proposal and related additional work, Ms. Kirkland has been damaged in an amount to be determined at trial, but anticipated to exceed the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

## NINTH CLAIM FOR RELIEF
## (PIERCING THE CORPORATE VEIL)

218.    Ms. Kirkland incorporates the foregoing allegations as if fully restated herein.

219.    Upon information and belief, ELL does not own the property on which it sits or operates, but instead separate limited liability companies own the trees and land.

220.    Upon information and belief, those limited liability companies operate in tandem with ELL, commingling funds and resources without the observance of corporate formalities between and among them.

221.    Upon information and belief, those limited liability companies do not observe arms-length contractual or transactional principles in their dealings.

222.    Upon information and belief, Mr. Sanders is the common owner of the limited liability companies.

223.    Upon information and belief, those limited liability companies have been established to defeat the ability of creditors of ELL to collect on judgments against ELL for services rendered in part by ELL but using the assets and resources of the related limited liability companies and passing those assets and resources off as if they were those of ELL.

224.    Accordingly, the corporate veil of ELL must be pierced to allow collection against the assets of the alter-ego limited liability companies and potentially Mr. Sanders if he is found to have acted in a manner inconsistent with the intended separateness of an individual from a corporate entity.

WHEREFORE, having fully pled, Ms. Kirkland demands judgment in her favor, and against Defendants, in an amount to be determined at trial, but in excess of the $75,000.00 jurisdictional minimum for diversity jurisdiction to exist.

Respectfully Submitted,


/s/ Matthew A. Rich
Matthew A. Rich (0077995)
Ashley M. Young (0096964)
Attorneys for Plaintiff Macy Kirkland
Katz Teller Brant & Hild
255 East Fifth Street, Suite 2400
Cincinnati, OH 45202
(513) 721-4532 Telephone
(513) 977-3475 Fax
mrich@katzteller.com
ayoung@katzteller.com

## **PRAECIPE FOR SERVICE**

Please serve a copy of the summons and complaint on Defendants by certified mail, return receipt requested, at the addresses listed in the caption of the case.

/s/ Matthew A. Rich
Matthew A. Rich