IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Macy Kirkland, | : | |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | Case No. 1:22-cv-414 |
| | : | |
| v. | : | Judge Susan J. Dlott |
| | : | |
| Environmental Landscape, LLC, *et al.*, | : | Order on Summary Judgment Motions |
| | : | |
| Defendants/Counterclaim | : | |
| Plaintiffs. | : | |

Plaintiff Macy Kirkland hired Defendants Environmental Landscape, LLC ("ELL") and

Robert T. Sanders to complete a multi-faceted landscaping project—a project estimated to cost

more than $600,000—at her hillside home overlooking the Ohio River.[1]  Kirkland sued

Defendants after numerous disputes arose between them, and then Defendants filed

counterclaims.  Three motions are pending before the Court:

- Amended Motion for Partial Summary Judgment filed by Defendants as to
  Kirkland's Sixth, Seventh, Eighth, and Ninth Claims for Relief (Doc. 56);

- Kirkland's Motion for Partial Summary Judgment as to Defendants'
  Counterclaims (Doc. 69); and

- Defendants' Motion for Partial Summary Judgment on their Fourth and
  Fifth Counterclaims (Doc. 70).

The motions are fully briefed and ripe for adjudication.  For the reason that follow, the Court will

**GRANT IN PART AND DENY IN PART** Defendants' Amended Motion for Partial Summary

Judgment as to Kirkland's claims (Doc. 56) and Kirkland's Motion for Partial Summary

Judgment as Defendants' counterclaims (Doc. 69).  The Court will **DENY** Defendants' Motion

---

[1]  The Court will refer to Kirkland as Plaintiff and to ELL and Sanders collectively as Defendants for the sake of brevity.  Kirkland also is the Counterclaim Defendant and ELL and Sanders also are Counterclaim Plaintiffs.

for Partial Summary Judgment on its counterclaims (Doc. 70).

## I. BACKGROUND

### A. Factual Background

Kirkland is the owner of property located at 1901 William Howard Taft Road, Cincinnati, Ohio 45206 ("the Property"). (Doc. 73 at PageID 3719.) ELL is a landscaping company, and Robert Sanders is an employee of ELL who oversees landscaping projects for ELL. (Doc. 48-2 at PageID 1002.) Jennifer Braddock is the sole owner and managing member of ELL. (Braddock Dep., Doc. 53 at PageID 2548.)

The Court conducted a site visit to the Property with the attorneys on November 7, 2022. The front of the Property has a steep incline from William Howard Taft Road up to Kirkland's house. There is a concrete patio directly behind the house and a large area with a pool, lawn, and landscaping to the side of the house.

### 1. The Contracts

Kirkland and ELL entered into three separate written contracts through which ELL agreed to perform tree planting and landscaping services for Kirkland at the Property: the Phase One Proposal, the Phase Two Proposal, and the Groundcover Proposal. (Doc. 73 at PageID 3719; Doc. 78 at PageID 3927.) Supplemental Conditions appeared on the reverse side of the Phase One Proposal, the Phase Two Proposal, and the Groundcover Proposal, and each contract was subject to the Supplemental Conditions. (Doc. 78 at PageID 3927.) Kirkland and ELL also entered into a written Masonry Proposal contract which was not subject to the Supplemental Conditions. There were no separate written contracts between Kirkland and Sanders in his individual capacity. (Doc. 55 at PageID 2656.)

The Phase One Proposal, prepared by ELL on or about October 5, 2021 and revised on

November 15, 2021, was accepted by Kirkland. (Doc. 19-1 at PageID 540–542; Doc. 55 at PageID 2654.) It involved the purchase and planting of particular types of trees and shrubs, including hornbeams, eastern red cedars, and boxwoods totaling $485,350. (Doc. 19-1 at PageID 540–542.) The Phase One Proposal did not include a start date, completion date, milestone date, or state that "time is of the essence." (Doc. 19-1 at PageID 540–542.)

ELL prepared the original Phase Two Proposal and submitted it to Kirkland on or about October 5, 2021. (Doc. 19-1 at PageID 544.) It involved the purchase and planting of particular types of trees and shrubs totaling $367,825. (Doc. 19-1 at PageID 544–547.) The Phase Two Proposal was revised and scaled back on November 15, 2021 to require Defendants to plant only three columnar oak trees and three eastern red cedar trees behind the pool equipment wall for a total of $53,850.00. (Doc. 19-1 at PageID 546.) Kirkland accepted the revised Phase Two Proposal. (Doc. 55 at PageID 2655; Interrog. Resp., Doc. 63 at PageID 3378.) The Phase Two Proposal did not include state a start date, completion date, milestone date, or state that "time is of the essence." (Doc. 19-1 at PageID 546–547.)

Sanders, on behalf of ELL, sent the original Phase One Proposal and the Phase Two Proposal to Kirkland as attachments to an October 6, 2021 cover letter. (Doc. 19-1 at PageID 549; Doc. 55 at PageID 2654.) Sanders explained in the cover letter how Defendants would address unforeseen obstacles or unsafe conditions, the use of subcontractors, and potential damage to unmarked underground utilities:

> Thank you for the opportunity to earn your business. The attached proposals are enclosed. The unit prices are attached, the quantity may change up or down slightly.
>
> These prices are based on us being able to plant with our tree spade. In the event of unforeseen obstacles or unsafe conditions, we would need to ball, burlap, and basket then plant with our telehandler and/or crane, this would be an additional charge. At this point we would reach out to you with an additional cost estimate/change order for your approval.

3

> Additionally, Implementation of a job like this can run into unforeseen obstacles underground and drainage challenges, we have enclosed a time and materials rate sheet, anytime we default to t/m we will consult with Jeff and keep track with a daily worksheet/log for approval. When we use subcontractors, we invoice at cost plus 25% (see enclosed).

(Doc. 19-1 at PageID 549.)  Sanders and Braddock testified that Kirkland was given the Unit Price Sheet that outlined the time and material charges including hourly or daily rates for him, a supervisor, skilled and general labor, and different items of equipment such as an excavator or tree spade.  (Doc. 10-2 at PageID 316; Sanders Dep., Doc. 49-1 at PageID 1162; Doc. 53 at PageID 2564.)  ELL intended for terms stated in the cover letter and the Unit Price Sheet to be a part of the parties' contracts for the Phase One Proposal and Phase Two Proposal.  (Braddock Dep., Doc. 53 at PageID 2559.)  Kirkland denied receiving the Unit Price Sheet, and she disputed that the cover letter contained contractual terms or conditions to which she agreed. (Doc. 49-6 at PageID 1532.)

ELL prepared the Groundcover Proposal on or about November 1, 2021, and it was accepted by Kirkland.  (Doc. 19-1 at PageID 585; Doc. 55 at PageID 2655.)  The Groundcover Proposal called for the planting of up to 250 units of 1-gallon ground cover at a rate of $38.75 per unit, plus nutrients, for a total cost of up to $12,837.50.  (Doc. 19-1 at PageID 585.)  It did not include a start date, completion date, milestone date, or state that "time is of the essence." (*Id.*)

The Supplemental Conditions to the Phase One Proposal, the Phase Two Proposal, and the Groundcover Proposal required that "[a]ll work . . . be completed in a professional workmanlike manner according to American Landscape Association Standard Practice."  (Doc. 19-1 at PageID 541.)  It also stated that "any changes, alternations, or deviations from the above specifications involving extra costs over and above specifications involving extra costs over and above the estimate will be executed with a written change order."  (*Id.*)

4

ELL prepared the Masonry Proposal on or about January 26, 2022, and it was accepted by Kirkland. (Doc. 19-2 at PageID 620; Doc. 55 at PageID 2655–2656.) It provided for the performance of masonry services at a total cost of $73,875 plus a consultation and management fee of 25%. (Doc. 19-2 at PageID 620.) It did not include a start date, completion date, milestone date, or state that "time is of the essence." (*Id.*) The Masonry Proposal did not include the Supplemental Conditions.

No formal written change orders were issued for the work under the Phase One or Phase Two Proposals. (Braddock Dep., Doc. 53 at PageID 2562.) But according to Defendants, the Phase One and Phase Two Proposals both contemplated that the planting site for each tree would be "shovel-ready, ready everything, us going up there, planting the tree, and leaving." (*Id.*) Defendants understood that if anything was required "in addition to planting the trees, that would revert to time and materials" charges. (*Id.*)

### 2. Work Performed

The parties dispute the scope and quality of work performed by Defendants, whether certain work was performed under the contracts or extra-contractually, and the amount owed for the work performed. Kirkland was not living at her home on the Property most of the time when Defendants were doing the landscaping work. Kirkland left for her house in Florida on or about October 9, 2021, days after receiving the original Phase One and Phase Two Proposals. (Kirkland Dep., Doc. 49-6 at PageID 1503–1504.) She returned to the Property in Cincinnati for a week around Christmas in December 2021 and then for ten more days in February or March, and then she came back to Cincinnati on June 11, 2022. (*Id.*) Kirkland understood that the landscaping project would be complete in May or June 2022. (Kirkland Dep., Doc. 49-11 at PageID 2017–2018.)

According to Kirkland:

> Defendants quoted more than 70 trees and 300 boxwoods to generate a face price of more than $800,000 in Phases 1 and 2, but only ever supplied a fraction of what was contemplated by the Phase One and Phase Two Proposals (11 of 20 hornbeams, 12 of 17 cedars, and 0 of 300 boxwoods on Phase One, and only 6 of the 37 trees quoted on Phase Two, most of which died and were removed before or as Defendants left the property).

(Kirkland Decl., Doc. 54 at PageID 2592.) Her statement about the contract requirements appears to be based on the revised Phase One Proposal and the original Phase Two Proposal.

The revised Phase One Proposal called for Defendants to plant 20 hornbeams, 17 eastern red cedars, and 300 boxwoods. (Doc. 19-1 at PageID 542.) Defendants charged Kirkland for planting 11 hornbeams and 12 eastern red cedars in Invoice #2498. (Doc. 1-2 at PageID 200.) There is no evidence that Defendants completed or charged Kirkland for the planting the rest of the trees contracted for in the original Phase One Proposal.

The original Phase Two Proposal called for planting 37 trees total of 7 different varieties. (Doc. 19-1 at PageID 544.) The revised Phase Two Proposal dated November 15, 2021, however, called for planting only 3 columnar oaks and 3 eastern red cedars behind the pool equipment wall. (*Id.* at PageID 546.) On February 16, 2022, Defendants charged Kirkland for planting 3 columnar oaks and 3 eastern red cedars behind the pool equipment wall in Invoice #2515. (Doc. 1-2 at PageID 205.) Kirkland later complained that eastern red cedar trees were not well-suited for the Property and that multiple trees died. (Doc. 19-3 at PageID 721–723.)

Defendants asserted that the original Phase Two Proposal required three preconditions: (1) Kirkland was to acquire a parcel of land from her neighbors, the Phillips; (2) Kirkland's land was to be graded and the soil prepared for planting; and (3) the work would begin only after the Phase One Proposal work. (Interrog. Resp., Doc. 63 at PageID 3378.) They also asserted that Kirkland told ELL on March 10, 2022 that she would be unable to buy or get an easement to the

Phillips 20-foot parcel of land.  (*Id.*; Kirkland Dep., Doc. 49-11 at PageID 2031.)  Because

Kirkland could not acquire the Phillips parcel, Defendants asserted that a retaining wall was

needed to complete the scope of work set forth in the original Phase Two Proposal.  (Interrog.

Resp., Doc. 63 at PageID 3378.)  On the other hand, Kirkland asserted that Defendants began

extra-contractual work related to the original Phase Two Proposal when they "grubb[ed] the

property line" between her property and her neighbors' property, dug and poured footers for a

retaining wall, and began to construct the retaining wall.  (Kirkland Decl., Doc. 54 at PageID

2594.)  Defendants did not complete the original Phase Two Proposal work before the parties'

disputes escalated and Defendants stopped working at the Property.  (Interrog. Resp., Doc. 63 at

PageID 3378.)

The invoices for payment submitted by Defendants to Kirkland—which the Court lists in

the subsection below—demonstrate that Defendants performed services under the Groundcover

Proposal and Masonry Proposal as well.  Kirkland testified that the groundcover installed was

"beyond insufficient" and had to be replaced.  (Doc. 49-11 at PageID 2030.)

Finally, the parties agree that Defendants performed work at the Property that was not

directly required by the four written contracts.  Kirkland testified that she authorized Defendants

or their subcontractors to perform other work:

> [I]f in the text we are conversing about what needs to be done and I say yes and I
> ask for a cost and he provides that, then it should -- that's a green light.

(Doc. 49-6 at PageID 1704–1706.)  She also testified that she authorized Defendants to complete

a project in her laundry room, work that was not associated with any of the written contracts.

(*Id.* at PageID 1702.)  Sanders testified that at one point Kirkland told him and Frank Dyer, his

masonry subcontractor, that "I love what you guys are doing. You don't even need to call me to

make these types of changes and I'll pay you for it."  (Doc. 49-2 at PageID 1191.)  He testified

that Defendants were asked to palletize and remove other contractors' materials from the Property.  (Doc. 49-9 at PageID 1934.)  He also stated that they prepared the area around the pool for the installation of artificial turf.  (*Id.* at PageID 1936.)

The parties have disputes about the work performed. The parties dispute whether the time and material charges for at least some of the work performed should be considered an amendment to or expansion of a particular contract or whether the work was extra-contractual.

Finally, Kirkland complains that Defendants did not complete all the work they started or that they completed it in an inadequate manner.  Kirkland asserted that she had to redo the retaining wall started by Defendants because the footers were improperly poured and poured without a permit.  (Kirkland Decl., Doc. 54 at PageID 2594.)  Kirkland also testified that Defendants took responsibility for building the foundation for an orangerie, but they did not build it.  (Doc. 49-11 at PageID 2024.)  She said that Defendants failed to grade the front yard. (*Id.* at PageID 2030.)  She asserted that Defendants agreed to install an irrigation system for the trees, but that the system they installed resulted in an insufficient water supply for her house. (*Id.* at PageID 2093–2095.)  Kirkland asserted that Defendants "never did the mortaring in of the treads and risers going down both sides of the fountain."  (*Id.* at PageID 2154.)  She asserted that they were supposed to do lighting work.  (*Id.* at PageID 2242.)

Defendants' final day at the Property was on or about June 30, 2022.  (Doc. 78 at PageID 3938.)  On or about July 6, 2022, Kirkland through her attorney gave ELL a final opportunity to complete certain aspects of the project, but ELL refused.  (Doc. 49-1 at PageID 2065–2066; Doc. 19-3 at PageID 721–723.)  Kirkland specifically wanted ELL to plant more hornbeam trees and replace red cedar trees—trees she stated were dead or failing to thrive—with holly trees at no cost.  (Doc. 19-3 at PageID 721–723.)  Kirkland filed this lawsuit less than two weeks later.

### 3.    Invoices

ELL submitted ten invoices for payment to Kirkland:

- Invoice #2498 dated February 16, 2022 in the amount of $262,387.50.  (Doc. 1-2 at PageID 200.)  It included items identified as "Contract," including a weeping beech, hornbeams, and red cedars, and management and overhead fees.  (Doc. 1-2 at PageID 200.)  This scope of work is consistent with the revised Phase One Proposal.  (Doc. 19-1 at PageID 542.)

- Invoice #2511 dated April 13, 2022 in the amount of $19,375.  It included an item identified as "Contract" and described as "Groundcover planted on riverside of pool down retaining wall as proposed."  (Doc. 1-2 at PageID 201.)  This scope of work is consistent with the Groundcover Proposal contract.  (Doc. 19-1 at PageID 585.)

- Invoice #2512 dated April 13, 2022 in the amount of $129,760.77.  It included charges for time and materials including excavator, dump trunk, topsoil, and stone charges.  (Doc. 1-2 at PageID 202–203.)

- Invoice #2514 dated May 5, 2022 in the amount of $88,110.94.  It included requests for payment under the "Masonry Contract" and management and overhead fees.  (Doc. 1-2 at PageID 204.)  This scope of work is consistent with the Masonry Proposal.  (Doc. 19-2 at PageID 620.)

- Invoice #2515 dated May 10, 2022 in the amount of $53,850.  It included a request for payment for three columnar oak and three red cedar trees.  (Doc. 1-2 at PageID 205.)  This scope of work and cost are identical to the revised and scaled back Phase Two Proposal.  (Doc. 19-1 at PageID 546.)

- Invoice #2543 dated July 5, 2022 in the amount of $103,369.67.  It included charges for miscellaneous materials and equipment, a subcontractor fee for pruning large trees, and management and overhead fees.  (Doc. 1-2 at PageID 209–210.)

- Invoice #2544 dated July 5, 2022 in the amount of $9,687.50.  It included charges for additional groundcover.  (Doc. 1-2 at PageID 211.)

- Invoice #2546 dated July 5, 2022 for $78,832.81.  It included charges for masonry work and masonry management and overhead fees.  (Doc. 1-2 at PageID 212.)

- Invoice #2561 dated August 25, 2022 for $6,475.  It included charges under a "Contract" for hornbeam trees and eastern cedar trees, with a credit for eastern cedar trees.  (Doc. 49-6 at PageID 1785.)

- Invoice #2562 dated August 25, 2022 for $412.83.  It included material charges and management and overhead fees.  (Doc. 49-6 at PageID 1793.)

The last two invoices were prepared after Kirkland sued Defendants on July 18, 2022.

### 4.    Payments

As explained below, Kirkland made three payments to ELL totaling $526,237.50, but Defendants assert that she still owes $223,217.45.

Defendants prepared a Statement dated May 10, 2022 that listed Invoices #2498, #2511, #2512, #2514, and #2515.  (Doc. 1-2 at PageID 206.)  It also showed that Kirkland made two $100,000 payments, one on January 3, 2022 and the other May 5, 2022.  (*Id.*)  The first $100,000 payment was a deposit.  (Doc. 49-6 at PageID 1573; Doc. 53 at PageID 2568–2569.)  Braddock, ELL's owner, testified that Kirkland made the second $100,000 to keep ELL from walking off the job for lack of payment.  (Doc. 53 at PageID 2568.)  She did not connect the payment to a particular invoice or a particular contract.  (*Id.*)  Kirkland testified that she did not know what the second $100,000 was for.  (Doc. 49-6 at PageID 1573.)  The amount due as of May 10, 2022 was $353,484.21.  (Doc. 1-2 at PageID 206.)

Kirkland made another payment in the amount of $316,237.50 on May 16, 2022, bringing her total payments made to $516,237.50.  (Doc. 65 at PageID 3398, 3400–3401.)  Braddock asserted that this third payment specifically covered Invoices #2498 and #2515, which together totaled $316,237.50.  (*Id.*)  Those Invoices appeared to relate to the Phase One Proposal and the Phase Two Proposal.

The next Statement dated July 9, 2022 showed a "balance forward" by June 8, 2022 of only $19,375.  (Doc. 1-2 at PageID 207.)  The Statement then listed Invoices #2543, #2544, and #2546 and showed a new amount due as $211,264.98.

Defendants prepared a final Statement dated August 29, 2022, after Kirkland filed the lawsuit, that shows an amount due of $223,217.45.  (Doc. 10-4 at PageID 362.)  It stated that

Kirkland still owed payments on Invoices #2511, #2543, #2544, #2546, #2561, and #2562.  (*Id.*)

**B.    Procedural History**

Kirkland filed the First Amended Complaint against ELL and Sanders on November 8, 2022.  (Doc. 19.)  She asserts nine claims for relief:

- First Claim for Relief: Breach of Contract—Phase One Landscaping Proposal;
- Second Claim for Relief: Breach of Contract—Phase Two Landscaping Proposal;
- Third Claim for Relief: Breach of Contract—Groundcover Proposal;
- Fourth Claim for Relief: Breach of Contract—Masonry Proposal;
- Fifth Claim for Relief: Breach of Contract—Billing Improprieties;
- Sixth Claim for Relief: Unjust Enrichment;
- Seventh Claim for Relief: Professional Negligence;
- Eighth Claim for Relief: Fraudulent Inducement by Mr. Sanders; and
- Ninth Claim for Relief: Fraudulent Inducement by ELL.

(*Id.* at PageID 512–530.)

Defendants then filed their Answer to First Amended Complaint and reasserted the eight-count Counterclaim they had initially filed on September 20, 2022.  (Doc. 21 at PageID 745 n. 1.)  Defendants' eight counterclaims are as follows:

- Counterclaim One: Breach of Contract;
- Counterclaim Two: Action on Account;
- Counterclaim Three: Unjust Enrichment;
- Counterclaim Four: Defamation/Slander;
- Counterclaim Five: Tortious Interference with Contractual and Business Relationships;
- Counterclaim Six: Fraud;
- Counterclaim Seven: Conversion; and
- Counterclaim Eight: Civil Theft.

(Doc. 10 at PageID 302–308.)

Following a lengthy period of discovery, the parties filed the pending Motions for Partial Summary Judgment.  First, Defendants filed an Amended Motion for Partial Summary Judgment as to the Sixth, Seventh, Eighth, and Ninth Claims for Relief—the non-contractual tort claims—

Kirkland asserted in the First Amended Complaint. (Doc. 56.)[2] Kirkland filed an Opposition, to which Defendants filed a Reply. (Docs. 55, 66.)

Next, Kirkland filed a Motion for Partial Summary Judgment as to each of Defendants' counterclaims. (Doc. 69.) Kirkland seeks partial summary judgment to the extent Defendants ask for damages related to time and materials in Counterclaims One and Two and complete summary judgment as to Counterclaims Three through Eight. Defendants filed a Memorandum in Opposition to which Kirkland filed a Reply. (Docs. 77, 85.)

Finally, Defendants filed a Motion for Partial Summary Judgment as to liability on their Counterclaims Four and Five against Kirkland. (Doc. 70.) Kirkland again filed an Opposition to which Defendants filed a Reply. (Docs. 73, 79.)

Neither party has moved for summary judgment on Kirkland's breach of contract claims nor on Defendants' breach of contract counterclaims to the extent Defendants ask for non-time and materials damages. Those claims will proceed to trial.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are disputed. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[2] Defendants initially filed the Motion for Partial Summary Judgment on July 19, 2024. (Doc. 48.) Defendants then filed an amended Motion for Partial Summary Judgment and a Notice on August 12, 2024 to remedy citation and formatting errors. (Docs. 56, 57.)

322–324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest on the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–801 (B.A.P. 6th Cir. 2007).

## III.    ANALYSIS

The Court will proceed by first addressing Kirkland's First Amended Complaint and whether Defendants are entitled to summary judgment on her Sixth through Ninth Claims for

Relief, the non-contractual tort claims.  Then the Court will address Defendants' Counterclaims

and whether either party is entitled to summary judgment.

**A.    Kirkland's First Amended Complaint—The Sixth, Seventh, Eighth, and Ninth Claims for Relief**

Defendants seek summary judgment on each of the non-contractual tort claims asserted

against them in Kirkland's First Amended Complaint.  (Doc. 56.)

**1.    Sixth Claim for Relief: Unjust Enrichment**

Kirkland alleges in key part in the Sixth Claim for Relief:

247. To the extent any of the parties' agreements are found to be quasicontractual or non-contractual, Ms. Kirkland has conferred a substantial benefit on Defendants through her payment of approximately $600,000.00 for work that has been substandard, delayed, not completed, and not beneficial to the Kirkland Property.

248. It would be unjust to permit Defendants to retain the benefit of Ms. Kirkland's payments without reimbursing Ms. Kirkland the difference between the value of the work actually performed and provided and what Ms. Kirkland has paid.

(Doc. 19 at PageID 520.)  To establish a claim for unjust enrichment in Ohio, a plaintiff must

prove three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by

the defendant of the benefit; and (3) retention of the benefit by the defendant under

circumstances where it would be unjust to do so without payment." *Cook v. Ohio Nat'l Life Ins.

Co.*, 961 F.3d 850, 858 (6th Cir. 2020) (quoting *Hambleton v. R.G. Barry Corp.,* 12 Ohio St. 3d

179, 465 N.E.2d 1298, 1302 (1984)).  "[A] plaintiff may not recover under the theory of unjust

enrichment or quasi-contract when an express contract covers the same subject." *Id.* (citation

omitted).

Defendants seek summary judgment on the unjust enrichment claim on several grounds,

including that any benefit conferred on Kirkland by ELL or Sanders by Kirkland's payments was

covered by one of the contracts between the parties.  The parties agree that the four written

contracts—the revised Phase One Proposal, the revised Phase Two Proposal, the Groundcover Proposal, and the Masonry Proposal—were valid and enforceable.  (Doc. 48-1 at PageID 1000; Doc. 55 at PageID 2654–2656.)  Kirkland cannot proceed on the claim to the extent that the express contracts govern.  *See Cook*, 961 F.3d at 858.  However, Kirkland expressly pleads that the unjust enrichment claim arises only "[t]o the extent any of the parties' agreements are found to be quasi-contractual or non-contractual."  (Doc. 19 at PageID 520.)  This is not a basis to grant summary judgment to Defendants.

Kirkland argues that her unjust enrichment claim survives in part to the extent she paid for a substantial volume of work that was separate from the written contracts.  She also argues that she should not be required to pay for any of the time and material or management charges because such charges were not set forth in the four corners of the written Phase One Proposal, Phase Two Proposal, or the Groundcover Proposal.  She must point to evidence that she conferred a benefit upon Defendants—the payment of money—for extra-contractual services that were not completed to her satisfaction.  Kirkland's final payment was on May 16, 2022, so her unjust enrichment claim must be based on the invoices she received and paid for prior to May 16, 2022.  (Doc. 65 at PageID 3398.)  The invoices dated prior to May 16, 2022 are Invoices #2498, #2511, #2512, #2514, and #2515.  (Doc. 1-2 at PageID 200–205.)

Invoice #2511 related to work under the Groundcover Proposal, Invoice #2514 related to work under the Masonry Proposal, and Invoice #2515 related to work under the revised Phase Two Proposal.  Payments made for those invoices can only be recovered under a breach of contract theory.  Only Invoices #2498 and #2512 included charges for time and materials or for management and overhead.  (*Id.*)[3]  Kirkland testified that most of the work charged for on

---

[3]  Invoice #5214 also included management fees, but the Masonry Proposal included management fees in the contract.  (Doc. 1-2 at 204; Doc. 19-2 at PageID 620.)

Invoice #2512 "was not included in any of the four contracts." (Doc. 49-6 at PageID 1677–1678.) She disputed that this invoiced work was done completely or satisfactorily. (*Id.* at PageID 1679–1688.) The Court will deny summary judgment to Defendants to the extent that Kirkland's unjust enrichment claim is based on the time, material, and management and overhead charges in Invoices #2498 and #2512.

### 2. Seventh Claim for Relief: Professional Negligence

Kirkland alleges in the Seventh Claim for Relief that "ELL and Mr. Sanders owed a duty of care to Ms. Kirkland to perform the services under the Phase One Proposal, the Phase Two Proposal, the Groundcover Proposal, the Masonry Proposal and all other agreements to the level of care reasonably expected of a professional in the landscaping and general contracting industries and at a workmanlike pace and quality." (Doc. 19 at PageID 520–521.) She then alleges that ELL and Sanders breached that duty several ways. (*Id.* at PageID 521.)

Defendants move for summary judgment on two bases. First, Defendants contend that Ohio law does not recognize a professional negligence claim against a landscaper. *See Gunlock v. Environ. Landscape, LLC*, No. 22cv95405, slip op. at 7 (Warren Cty., Ohio C.P. June 28, 2024) (stating that "there is no precedent in Ohio holding the level of skill of a landscaper to a standard of professionalism" for which a tort claim would lie).[4] Kirkland appears to concede this point. She argues in her Opposition brief only that Defendants had a duty of professionalism when they served as general contractors as to the masonry work and non-contractual work. The Court will grant summary judgment to Defendants on the landscaping professional liability claim.

The Court turns then to the general contractor professional liability claim. Defendants move for summary judgment on the basis that a separate tort claim will not lie where it is

---

[4] Filed in the docket in this case at Doc. 48-4.

intertwined with breach of contract claims for the same conduct. In Ohio, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981); *see also Pham Constr. & Co., LLC v. Tran*, 236 N.E.3d 849, 857, 2024-Ohio-634 (Ohio App. 5th Dist. 2024) (same). "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Pham Constr.*, 236 N.E.3d at 857 (citation omitted). "In other words, a cognizable tort action must allege a breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation." *Hilsinger Bldg. & Dev. Corp. v. Terracon Consultants, Inc.*, No. 1:18-CV-900, 2019 WL 4601774, at *6 (S.D. Ohio Sept. 23, 2019) (internal quotation and citation omitted). Also, a plaintiff must prove "actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of the contract." *Hilsinger*, 2019 WL 4601774, at *6 (citation omitted and emphasis in the original).

The professional negligence claim stated by Kirkland in the First Amended Complaint fails under this standard. She expressly alleges that Defendants' duty arises "under the Phase One Landscaping Proposal, the Phase Two Landscaping Proposal, the Groundcover Proposal, the Masonry Proposal and all other agreements." (Doc. 19 at PageID 520.) She does not expressly seek or identify damages caused by the alleged professional negligence apart from those arising under the contracts. (*Id.* at PageID 520–521, 530–531.) Her claim as pleaded fails as a matter of law.

In response to the summary judgment motion, Kirkland tries to expand her claim to argue

that Defendants breached their duty of professionalism when they served as the general

contractor for extra-contractual work performed. However, Kirkland cannot change the theory

of her claim at the summary judgment stage. *Tucker v. Union of Needletrades, Indus. & Textile*

*Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing 10A Wright, Miller, and Kane, Fed. Pract. and

Pro. § 2723 (3d ed. Supp. 2005)); *see also Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496

(6th Cir. 2019) (applying *Tucker*). Even if Kirkland had timely made this argument, the district

court in *Hilsinger* found the defendant's duty arose from the parties' agreements and were

grounded in contract only:

> Plaintiffs' argument that Terracon had an independent duty with respect to work it
> performed outside the list of services expressly described in the parties'
> agreement (*e.g.,* remediation work) is also unavailing. In making this argument,
> Plaintiffs lose sight that the test is not whether Defendant performed work outside
> the scope of the contract, but rather whether Defendant had a duty *independent* of
> that arising out of the parties' agreements. . . . [H]ere, the parties are in privity of
> contract.

2019 WL 4601774, at *7. Likewise, here, Defendants' duties to Kirkland arise out of their

contractual relationship. "[I]f two parties enter into an agreement in which one party promises to

build something in the future, the duty to build in a workmanlike manner arises out of the

contract." *Evans Landscaping, Inc. v. Stenger*, 969 N.E.2d 1264, 1268, 2011-Ohio-6033, ¶ 17

(Ohio App. 1st Dist. 2011). Kirkland identifies no case on point holding that a general

contractor's duty of professionalism arises in tort when the parties are in contractual privity. The

Court will grant summary judgment to Defendants on Kirkland's Seventh Claim for Relief for

professional negligence.

### 3. Eighth Claim for Relief—Fraudulent Inducement by Sanders

Kirkland alleges in the Eighth Claim for Relief that Sanders knowingly misrepresented to

Kirkland in telephone conversations on January 14, 18, 20, 21, and 26, 2022 that he had

"licensure, qualifications, expertise, and experience he did not have in order to procure the

Masonry Proposal contract, additional ancillary exterior work, and also work inside Ms. Kirkland's home." (Doc. 19 at PageID 522.) To prove fraud or fraudulent inducement, a plaintiff must establish "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (quoting *Lepera v. Fuson,* 83 Ohio App. 3d 17, 613 N.E.2d 1060, 1063 (1992)).

Sanders moves for summary judgment on the grounds that he did not make actionable fraudulent misrepresentations about his licensure, qualifications, expertise, or experience. He relies on Kirkland's deposition testimony to prove her lack of evidence. As to licensure, Kirkland could not identify any statement by Sanders during January 2022 in which he claimed to be licensed. (Kirkland Dep., Doc. 49-6 at PageID 1713–1715, 1722.) As to the statements Sanders made about his qualifications, Kirkland said that Sanders told her that he was qualified to recognize that Frank Dyer, his masonry subcontractor, was a competent craftsman of masonry work because he had known and used Dyer for 30 years. (*Id.* at PageID 1643–1644, 1716.) Kirkland has not proven that statement was false.

In fact, in her Opposition brief, Kirkland identifies only one specific statement Sanders made about his qualifications, expertise, or experience that was purportedly false.[5] She argues that Sanders lied when he told her that "[he] had experience in masonry work and [he] had experience in doing some antique masonry work also." (Sanders Dep., Doc. 49-2 at PageID

---

[5] To the extent that Kirkland suggests that Sanders had a duty to affirmatively disclose that he lacked experience and appropriate licensure, the claim fails as a matter of law. Kirkland has not cited a case holding that a general contractor had an affirmative duty to disclose that he was not licensed.

1183.)  Kirkland states that this was false because Sanders's personal experience in masonry was limited to hardscapes such as sidewalks, and patios, and pavers.  (*Id.* at PageID 1185, 1188–1189.)  For other types of projects, ELL would subcontract out the masonry work to Frank Dyer.  (*Id.* at PageID 1185, 1188–1189.)  The Court does not find Sanders's statements to be actionable.  The evidence shows that Kirkland had met Dyer at her property and knew that ELL would subcontract the masonry work to Dyer before she entered into the Masonry Proposal contract on or after January 26, 2022.  (Doc. 19-2 at PageID 620; Dyer Dep., Doc. 62-1 at PageID 2769–2770.)

The rest of Kirkland's argument on the fraudulent inducement claim, based on alleged lack of experience and poor results, is overly broad and not supported by citation to specific evidence.  (Doc. 55 at PageID 2648.)  "[C]ourts need not independently comb through the record and establish that it is bereft of a genuine issue of material fact before granting summary judgment."  *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 734 (6th Cir. 2011).  As the Sixth Circuit has colorfully recognized, district judges "are not like pigs, hunting for truffles."  *Id.* at 736 (citation omitted).

For these reasons, the Court will grant summary judgment to Sanders on Kirkland's fraudulent inducement claim.

### 4.  Ninth Claim for Relief: Fraudulent Inducement against ELL

Kirkland alleges in the Ninth Claim for Relief that ELL fraudulently induced her into entering in the landscaping contracts by making two primary misrepresentations.  First, she alleges that ELL misrepresented that it could provide a landscaping solution that afforded Kirkland privacy and noise buffering from the traffic on William Howard Taft Road that looked like the illustrations—attached to the First Amended Complaint as Exhibit B—it provided to her.

20

(Doc. 19 at PageID 526–530; Doc. 19-1 at PageID 536–538.)  Second, she alleges that ELL recommended that she plant eastern red cedars, which it misrepresented were "[e]xtremely durable and tough" and could be "pruned to be a solid screen," instead of the magnolia trees that she favored.  (Doc. 19 at PageID 527; Doc. 19-3 at PageID 741.)

Despite these allegations, both parties appear to understand that Kirkland is asserting a slightly different claim against ELL at this summary judgment stage.  Kirkland asserts that ELL never intended to perform the full scope of the Phase One Proposal or the original Phase Two Proposal, but ELL instead floated the proposals totaling more than $800,000 to see if Kirkland was prepared to spend significant sums of money to landscape her yard.  She argues that ELL used the Phase One and Two Proposals to get access to Property and upsell Kirkland on additional work, including services that incurred a 25% management fee.

Kirkland argues that ELL supplied only $275,000 in trees, the subject of the parties' first two contracts, but it billed her more than $750,000 for its work.  (Doc. 1-2 at PageID 200–214.) In making this argument, she ignores that the total charges included charges for work performed under the Groundcover and Masonry Proposals as well.  Also, Sanders and Braddock, ELL's owner, both specifically averred that ELL intended to fulfill the Phase One and Two Proposals. (Sanders Aff., Doc. 48-2 at PageID 1004–1005; Braddock Aff., Doc. 48-3 at PageID 1006–1007.)  They also pointed out that ELL planted 11 of the 20 hornbeams and 12 of the 17 eastern red cedars called for in the revised Phase One Proposal and all 6 trees called for in the revised Phase Two Proposal.  (Kirkland Decl., Doc. 54 at PageID 2592.)

The mere fact that ELL did not fulfill all its obligations under the Phase One and Two Proposals is not itself sufficient to prove fraudulent intent.  "In order to be the basis for an action for fraud . . . the alleged misrepresentation cannot be predicated simply upon a promise to

21

perform that subsequently is unfulfilled. Rather, the plaintiff must prove by a preponderance of the evidence, that at the time the promise to perform was made, the promisor did not intend to fulfill the promise." *Michael J. Cavill 2012 Irrevocable Tr. v. BMC Growth Fund LLC*, No. 3:17-CV-270, 2018 WL 4690792, at *4 (S.D. Ohio Sept. 28, 2018) (quoting *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 326 (1995)). Kirkland is offering only speculation and conjecture that ELL did not intend to fulfill the Phase One and Phase Two Proposals. That is insufficient at this stage in the litigation to support a fraudulent inducement claim. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference" of fraudulent intent at the summary judgment stage. *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986).

The Court will grant summary judgment to ELL on the fraudulent inducement claim stated in the Ninth Claim for Relief.

**5. Summary**

The Court will deny summary judgment to Defendants on Kirkland's Sixth Claim for unjust enrichment to the extent it is based on the time, material, and management and overhead charges in Invoices #2498 and #2512. The Court will grant summary judgment to Defendants on Kirkland's Seventh, Eighth, and Ninth Claims for professional negligence and fraudulent inducement.

**B.    Defendants' Counterclaims**

Plaintiffs move for summary judgment as to each of Defendants' eight counterclaims, and Defendants move for summary judgment only on its counterclaims for defamation and tortious interference. The Court will address each counterclaim in order.

### 1.      Counterclaims One and Two—Breach of Contract and Action on Account

Defendants allege in Counterclaim One that Kirkland breached the Phase One Proposal, the Unit Price Sheet, and Groundcover Proposal, and the Masonry Proposal contracts by not paying ELL for materials and completed work and by not allowing ELL to finish its work.  (Doc. 10 at PageID 302.)  Likewise, Defendants allege in Counterclaim Two that Kirkland owes them for unpaid invoices as listed in the August 29, 2022 Statement.  (*Id.*  at PageID 303; Doc. 10-4 at PageID 362.)  Kirkland moves for summary judgment on these counterclaims to the extent that Defendants seek to recover the $103,369.67 listed on Invoice #2543 for time and material costs related to the Phase One Proposal, the Groundcover Proposal, and the Masonry Proposal.  (Doc. 69 at PageID 3563; Doc. 1-2 at PageID 209–210.)

Kirkland denied during her deposition that she received the Unit Price Sheet from Defendants, a document which listed ELL's charges for time and materials over and beyond the costs specified in the contract.  (Doc. 49-6 at PageID 1532–1533.)  She points out that the Supplemental Condition applicable to these contracts stated that "any changes, alternations, or deviations from the above specifications involving extra costs over and above specifications involving extra costs over and above the estimate will be executed with a written change order." (Doc. 19-1 at PageID 541.)  She argues that because no formal written change orders were issued or signed, (Braddock Dep., Doc. 53 at PageID 2562), that she cannot be required to pay time and materials related to the Phase One Proposal, the Phase Two Proposal, or the Groundcover Proposal.

Contrary to Kirkland's argument, these counterclaims are not appropriate for summary judgment because material facts are disputed.  To begin, neither party has pointed to evidence demonstrating to what written contract the time and material charges in Invoice #2543 are

related, or whether they are related to non-contractual work undertaken by Defendants. Whether Kirkland received the Unit Price Sheet with the time and materials fees is disputed because Sanders and Braddock testified that Kirkland was given the Unit Price Sheet. (Sanders Dep., Doc. 49-1 at PageID 1162; Doc. 53 at PageID 2564.) And the contracts contain language suggesting that additional charges could be incurred for services rendered without a written change order. For example, the revised Phase One and Phase Two Proposals recognized that soil preparation might be needed: "Soil Fracturing $4.00/sf as needed." (Doc. 19-1 at PageID 542, 546.)

Finally, Kirkland testified that she approved some additional work by text messages, suggesting that the parties modified their written contract by their course of conduct. (Doc. 49-6 at PageID 1704–1706.) "[A]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing." *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, 636 F. Supp. 3d 838, 872 (S.D. Ohio 2022) (citation omitted); *see also KAM Dev., LLC v. Marco's Franchising, LLC*, No. 3:20-CV-2024, 2024 WL 87758, at *7 (N.D. Ohio Jan. 5, 2024) ("Even if the contract requires amendments to be in writing, oral modifications may be demonstrated by a course of conduct.") There is a question of fact whether the parties modified their written contracts by their course of conduct. For these reasons, the Court will deny summary judgment to Kirkland on the Counterclaims One and Two.

### 2. Counterclaim Three—Unjust Enrichment

Defendants plead Counterclaim Three in the alternative to Counterclaims One and Two. Defendants allege that Kirkland owes them $233,217.45—the amount listed in the August 29, 2022 Statement—under a theory of unjust enrichment to the extent that the amounts allegedly owing are incurred under valid written contracts. (Doc. 10 at PageID 304.) Defendants will not

be able to recover payment under an unjust enrichment theory for any charges that arise under the valid written contracts. However, the record is not clear under which contract, if any, the charges on at least Invoices #2512, #2543, and #2562 arise. It follows that questions of fact remain on whether Defendants are entitled to payment for materials or services rendered under an equitable theory. The Court will deny summary judgment to Kirkland on the unjust enrichment counterclaim.

### 3. Counterclaim Four—Defamation

Defendants allege in Counterclaim Four that Kirkland made false and defamatory statements about them to subcontractors, clients, and the public. (Doc. 10 at PageID 304–305.) Both parties move for summary judgment on this counterclaim. "Defamation is a false publication that injures a person's reputation, exposes the person to public hatred, contempt, ridicule, shame, or disgrace, or affects the person adversely in his or her trade or business." *Sabino v. WOIO, L.L.C.*, 56 N.E.3d 368, 376 (Ohio App. 8th Dist. 2016). "[I]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 669, 2016-Ohio-491 (Ohio 1983), *abrogated on other grounds by*, *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). "[I]f allegedly defamatory words are susceptible to two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Id.*

"The elements of defamation are (1) a false and defamatory statement, (2) unprivileged publication to a third party, (3) a requisite amount of fault on the part of the publisher, and (4) actionability or special harm caused by the statement." *SPX Corp. v. Doe*, 253 F. Supp. 2d 974, 978 (N.D. Ohio 2003). "[T]ruth is a complete defense to a claim for defamation." *Hartman*

*v. Kerch*, 217 N.E.3d 881, 896, 2023-Ohio-1972, ¶ 37 (Ohio App. 8 Dist. 2023) (citation omitted). "Whether a defamatory statement is substantially true is a question of fact . . . ." *Id.* at 897.

Defamation *per se* is when "the defamation is accomplished by the very words spoken or written[,]" while defamation *per quod* is when "a statement with an apparently innocent meaning becomes defamatory through interpretation or innuendo." *Sabino*, 56 N.E.3d at 376. A statement is defamatory *per se* if it "reflects upon the character of such person by bringing him into ridicule, hatred, or contempt, or affects him injuriously in his trade or profession by the use of unequivocal words." *Concrete Creations & Landscape Design LLC v. Wilkinson*, 2021-Ohio-2508, ¶ 27 (Ohio App. 7 Dist. 2021) (internal quotation and citation omitted). Words that charge with an indictable offense involving moral turpitude and words that injure a person in his trade or occupation are both examples of defamatory *per se* statements. *Croce v. N.Y. Times Co.*, 345 F. Supp. 3d 961, 975 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787 (6th Cir. 2019).

` Whether an allegedly defamatory statement is protected opinion or actionable assertion of fact is a question of law for the district court. *See SPX Corp.*, 253 F. Supp. 2d at 978; *Hartman*, 217 N.E.3d at 898. "Consideration of the totality of circumstances to ascertain whether a statement is opinion or fact involves at least four factors. First is the specific language used, second is whether the statement is verifiable, third is the general context of the statement and fourth is the broader context in which the statement appeared." *Scott v. News-Herald*, 25 Ohio St. 3d 243, 496 N.E.2d 699, 706 (1986). The Court will examine each allegedly defamatory statement or set of statements in turn.

### a. "Con Man" and "Crook"

Kirkland admitted at her deposition that she described Sanders as a "con man or words to

that effect" to third parties including to Emily Kramer (her employee), Jen Jackson (her best friend in Cincinnati), Amy Oyster (a close friend), Margaret Kubicki (an attorney and friend), Kirsten Mack (a friend), Jeff Stwarska (a project foreman),[6] and Randy Gunlock (a friend and ELL client).  (Doc. 49-11 at PageID 2184–2188.)  She similarly called Sanders a "crook" to Kramer and in one text to Stwarska on July 6, 2022:

> Hey Jeff it's Macy. Any interest in doing anything over here? I totally understand if not . . . but I've had to file a major lawsuit against Robert [Sanders]. He is a crook and I feel certain he set you up now.

(Doc. 49-11 at PageID 2322.)  Defendants seek summary judgment on this subclaim on the grounds that such statements are defamatory *per se* because the statements impugn them in their trade or profession.  Kirkland, on the other hand, moves for summary judgment on this subclaim on the grounds that such statements are protected opinion, not actionable statements of fact.

Courts examining similar situations of name-calling are split as to whether such statements are defamatory or protected opinion.  The majority position seems to be that such name-calling is not defamatory.  An Ohio court held that a client who texted to a friend that his contractor was a "scammer" could not be held liable for defamation because he expressed an opinion.  *Concrete Creations*, 2021-Ohio-2508, ¶¶ 57–58.  Similarly, a different state court concluded that an attorney who called a polygraph operator a "simply a con artist" was not liable for defamation for the same reason.  *Niotti-Soltesz v. Piotrowski*, 86 N.E.3d 1, 8, 2017-Ohio-711 (Ohio App. 11th Dist. 2017).  A judge in this District Court concluded that the term "con artist" was only "loosely definable" and therefore an opinion.  *Yellow Book USA, Inc. v. Brandeberry*, 3:10-cv-025, 2011 WL 2672342, at *5 (S.D. Ohio 2011).  On the other hand, a different judge in

---

[6] Stwarska was a foreman that Kirkland hired to oversee most of the projects she did on the Property prior to retaining Defendants for the landscaping projects.  (Kirkland Dep., Doc. 49-11 at PageID 1992.)  Stwarska was overseeing an ongoing project for Kirkland on the Property when Defendants started their landscaping work.  (*Id.* at PageID 1997–1999.)

this District Court stated that a defendant's use of the term "scammer" in emails and other forums widely viewed in the plaintiffs' business community was defamation *per se*. *N. Am. Recycling, LLC v. Texamet Recycling, LLC*, 2:08-cv-579, 2010 WL 1226403, at *3 (S.D. Ohio Mar. 24, 2010).

With this backdrop, the Court will apply the *Scott* test for differentiating between opinions and statements of fact. First, the Court must examine what "meaning . . . a reasonable listener would attach to the statement." *Niotti-Soltesz*, 86 N.E.3d at 5–6 (citation omitted). Like the term "scammer" in *Concrete Creations*, the terms "con man" and "crook" are "loosely definable or inherently imprecise and subject to myriad subjective interpretations." 2021-Ohio-2508, ¶ 50 (internal quotation and citation omitted). Second, the statement that Sanders was a "con man" or "crook" is not readily verifiable when Kirkland did not also give examples of what he did. A statement that "lacks a plausible method of verification" is more likely to be "value-laden and to represent[] a point of view that is obviously subjective." *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279, 283, 649 N.E.2d 182, 186 (1995) (citation omitted). The *North American Recycling* case provides a useful contrast in this regard. Along with using the term "scammer," the defendants stated that the plaintiffs "have scammed over 7 companies out of hundreds of thousands of dollars." *N. Am. Recycling*, 2010 WL 1226403, at *3. That statement is on its face more factual and verifiable than Kirkland simply calling Sanders a "con man" or "crook."

Finally, the Court has little evidence about the general or broader context in which Kirkland described Sanders as a "con man" or in similar terms. The Court knows she made such statements to her friends, her employee, and a foreman she regularly used. The evidence shows that she was furious at Defendants. That Kirkland testified that she "described" Sanders as a

"con man" and "crook" supports that inference that she was stating her opinion, not giving a statement of objective fact. (Doc. 49-11 at PageID 2184–2185.) The Court will grant summary judgment to Kirkland and deny it to Defendants on the "con man" or "crook" sub-counterclaim because such descriptions of Sanders were protected opinion in the totality of the circumstances.

Related defamation sub-counterclaims fail as well. Defendants suggest in their briefing that Kirkland also believed Sanders was a "shyster[,]" but they provide no evidence that she called him a "shyster" to any other person. They assert that Kirkland called Sanders a "criminal," but the cited evidence shows that Randy Gunlock told Kirkland that Sanders was a "criminal." (*Id.* at PageID 2205.) Lastly, Defendants assert that Kirkland told an electric contractor that Defendants cheated her out of "millions of dollars," but they support that allegation only with hearsay evidence. (Sanders ELL Dep., Doc. 67 at PageID 3430.) The Court will grant summary judgment to Kirkland and deny it to Defendants on these defamation subclaims as well.

### b. Email to Alexander and Liz Phillips on July 7, 2022

Defendants also allege that Kirkland made defamatory *per se* statements in the following email she sent to her neighbors, the Phillips, on July 7, 2022:

> I wanted to give you an unfortunate update on what is taking place on my property. I returned to Cincinnati in mid-June to find a complete disaster that I am resolving as quick as possible. Without going into many details, I have filed, as of yesterday, a lawsuit against Robert Sanders (Environmental Landscape). They have been sending me photo shopped pictures of what the [sic] claim was done and that I would return to the entire project completed. I have been scammed out of more than a million dollars and returned to a war zone. . . I
>
> am so embarrassed and want you to know that I am addressing this swiftly. I am so sorry you have had to endure this, but I had no idea from what they were telling me and the photos they sent.

(Doc. 49-11 at PageID 2360.) Defendants argue that Kirkland's statements that Defendants sent her photoshopped photos and that Defendants scammed her out of more than one million dollars

were false and defamatory per se. Kirkland asserts that the statements are not defamatory because they were substantially true and were protected by a common interest privilege.

The Court will begin with Kirkland's defense that she had a qualified privilege to make these statements to the Phillips because they shared a common interest in their adjoining properties.[7] "A qualified privilege is an affirmative defense to a claim of defamation." *Hill v. Ohio Dep't of Rehab. & Corr*, 168 N.E.3d 583, 589, 2021-Ohio-561, ¶ 17 (Ohio App. 10th Dist. 2021) (citation omitted); *see also Jamison v. Galena*, 38 N.E.3d 1176, 1190, 2015-Ohio-2845, ¶ 57 (Ohio App. 5th Dist. 2015) (same). Kirkland did not plead this affirmative defense in her Answer to Defendants' Counterclaim. (Doc. 13.) Her failure to timely raise the affirmative defense results in a waiver. *See Anderson v. WBNS-TV, Inc.*, —N.E.3d—, 2024-Ohio-4880, ¶ 22 (Ohio App. 10th Dist. 2024) ("Failure to raise an affirmative defense in a responsive pleading or amended pleading constitutes a waiver of the defense."); *Stepp v. Wiseco Piston Co., Inc.*, 2013-Ohio-5832, ¶ 27 (Ohio App. 11th Dist. 2013) (stating the qualified privilege defense is waived if not properly raised). Defendants were denied the opportunity to conduct discovery on this qualified privilege defense. Kirkland cannot assert the defense for the first time now to defeat a summary judgment motion.

Next, the Court must examine whether the statements in the email were substantially true. A statement is not defamatory if it is "substantially true" or the "gist" of it is true. *Krems v. Univ. Hosps. of Cleveland*, 133 Ohio App. 3d 6, 726 N.E.2d 1016, 1019–1020 (Ohio App. 8th Dist. 1999). This issue constitutes a question of fact. *Hartman*, 217 N.E.3d at 896–897. Kirkland admitted at her deposition that her statements about the photoshopped pictures and the

---

[7] The elements necessary to establish a qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Jackson v. Columbus*, 117 Ohio St. 3d 328, 883 N.E.2d 1060, 1064, 2008-Ohio-1041 (2008) (citation omitted). A qualified privilege can be defeated with a showing of actual malice. *Id.*

cost of the project were inaccurate, but she contends that the gist of her email was true. (Doc. 49-11 at PageID 2194–2195, 2260–2261.) Kirkland admitted that she mis-used the term "photo shop" because she was "not tech savvy." (*Id.* at PageID 2194–2195.) She testified that she meant that Defendants had misled her by sending her photos of what her property would look like in the future after the landscaping matured, rather than how it would look at the time the project was completed. (*Id.*) As to the latter statement, Kirkland testified that the $1,000,000 was her initial estimate of her damages. (*Id.* at PageID 2261.) The evidence now shows that she paid Defendants only $516,237.50. (Doc. 65 at PageID 3398, 3400–3401.) Finally, there is no dispute that Kirkland was dissatisfied to find that the landscaping project was incomplete and her yard still an active construction site when she returned home from Florida. A jury hearing the evidence at trial will be better positioned to determine whether Kirkland's statements to her neighbors were substantially true or defamatory. The Court will deny summary judgment to both Kirkland and Defendants on this Phillips email subclaim.[8]

### c. Statements to Frank Dyer

Defendants also assert that Kirkland made defamatory statements in early July 2002 to Frank Dyer, a brick mason used by Defendants as a subcontractor. She told Dyer that Sanders "does not have a legitimate business" and that Sanders "has padded [h]is fraudulent accounts at the expense of others." (Doc. 68-1 at PageID 3471.) She later told him that Sanders had "$7

---

[8] Kirkland also argues that she is entitled to summary judgment because Defendants cannot prove damages. Damages are presumed for defamation *per se*. Some cases suggest that presumption of damages can be rebutted. *See Hartman,* 217 N.E.3d at 902; *Wilson v. Wilson*, 2007-Ohio-178, ¶¶ 12–15 (Ohio App. 2d Dist. 2007). However, other cases suggest that nominal damages can be awarded without proof of special damages. *See Rosado-Rodriquez v. Nemenz Lincoln Knolls Mkt.*, 159 N.E.3d 1214, 1220, 2020-Ohio-4814, ¶ 20 (Ohio App. 7th Dist. 2020) ("The law assumes the existence of some damages and the proof of the defamation itself established the existence of some damages.") (internal quotation and citation omitted); *Shoemaker v. Comty. Action Org. of Scioto Cty., Inc.*, 2007-Ohio-3708, ¶ 13 (Ohio App. 4 Dist. 2007) (stating that for defamation *per se* "general damages are presumed and nominal damages are available in any event"). The Court will not grant summary judgment to Kirkland on the Phillips defamation subclaim based on a lack of damages.

million worth of debt he beat people out of" and that he was "in a lot of trouble."  (*Id.* at PageID 3473.)[9]

Defendants argue that these statements are defamatory *per se*, but Kirkland argues that they are not defamatory because they are statements of opinion or are substantially true.  Again, the Court must look at the specific language used, whether the statement is verifiable, and the general and broader context to determine whether the statement is fact or opinion.  *Scott*, 496 N.E.2d at 706.  The phrases "legitimate business" and "padded [h]is fraudulent accounts" are not clearly defined, and they could have different meaning to different people.  The same is true of Kirkland's assertion that Sanders was "in a lot of trouble."  Likewise, those three statements are not verifiable because they lack precise meaning.  The context in which the statements were made is that Kirkland was trying to retain Dyer, Defendants' subcontractor, to complete the masonry projects at her property even though Defendants were no longer the general contractor.  All of these factors indicate that Kirkland was expressing protected opinions, not actionable assertions of fact when she said Sanders did not have a legitimate business, padded fraudulent accounts, and was in a lot of trouble.

Finally, Kirkland's alleged statement to Dyer that Sanders had "$7 million worth of debt he beat people out of" also is not actionable.  To begin, Kirkland denied making the statement.  (Doc. 68-1 at PageID 3473.)  The statement is also non-sensical hyperbole on its face.  The phrase "beat people out of" is susceptible to many meanings and is not verifiable.  If it means that Sanders took $7,000,000 from others, then he would not have $7,000,000 in debt.

---

[9]  Defendants also complain that Kirkland made two other allegedly defamatory statements to Dyer, but the Court cannot find evidence of those statements in the record.  Defendants assert that Kirkland told Dyer she would be "'surprised' if Defendants had paid many of their contractors."  (Doc. 70 at PageID 3595.)  Defendants cite Doc. 68-1 in support of that assertion, but Kirkland does not use the word "surprised" in that document.  Also, Defendants assert that Kirkland told Dyer that she called Keeneland—one of ELL's longtime clients—to ask about Sanders.  (Doc. 49-11 at PageID 2198–2199.)  This statement was false, but it is not defamatory because it does not impugn Kirkland's reputation in any way.

For these reasons, the Court finds as a matter of law that Kirkland's statements to Dyer were statements of opinion and not actionable defamatory statements. The Court will grant summary judgment to Kirkland and deny it to Defendants on the Dyer statements subclaim.

### 4.    Counterclaim Five—Tortious Interference

In the Counterclaim, Defendants allege that Kirkland tortiously interfered with their business relationship with Keeneland, an entity with whom Kirkland had worked for thirty-five years, and other clients and customers. (Doc. 10 at PageID 300–301, 305.) Defendants have now abandoned the counterclaim as to interference with Keeneland because discovery has established that Kirkland did not have any contact with Keeneland. (Kirkland Dep., Doc. 49-11 at PageID 2198–2199; Sanders ELL Dep., Doc. 67 at PageID 3433.) Instead, Defendants contend that Kirkland tortiously interfered with their relationship with Frank Dyer, their masonry subcontractor, and with Randy Gunlock, their customer and Kirkland's friend. Both Kirkland and Defendants move for summary judgment on this counterclaim.

"The elements of tortious interference with a business relationship are (1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co*., 148 Ohio App. 3d 596, 604, 774 N.E.2d 775, 780, 2002-Ohio-3932, ¶ 23 (Ohio App. 3rd Dist. 2002). The elements of a tortious interference with contract claim are: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858, 1999-Ohio-260 (1999).

The subclaim as to Frank Dyer can be quickly resolved. As discussed above regarding

the defamation claim, Kirkland told Dyer that Sanders did not have a "legitimate business," and she tried to get Dyer to complete the masonry work for her directly.  (Doc. 68-1 at PageID 3471–3473.)  Dyer told Kirkland that her statements had "caused a great deal of pressure on mine and his relationship after 14 years."  (Doc. 68-1 at PageID 3473.)  This pressure from Kirkland, however, did not cause a breach or termination of the relationship between Defendants and Dyer. Dyer testified at his deposition in 2023 that he still worked with ELL.  (Doc. 62-1 at PageID 2738.)  Therefore, Kirkland cannot be held liable for tortious interference with Defendants' business relationship with Dyer.

Defendants also contend that Kirkland's interference led to a breach of their contract or relationship with Randy Gunlock to provide him tree planting services.  The parties agree that Defendants had an agreement to plant trees for Gunlock, an agreement about which Kirkland was aware.  (Doc. 49-11 at PageID 2188–2191.)  Kirkland arguably attempted to interfere in the relationship between Gunlock and Defendants.  She told Gunlock that Sanders was a con man and, on June 21, 2021, she instructed her assistant to tell Gunlock "not to pay a penny to Robert [Sanders]."  (Doc. 49-11 at PageID 2188–2191, 2205, 2374.)  Finally, there is evidence that Gunlock did not pay invoices submitted to him by Defendants, which led to a lawsuit between Gunlock and Defendants, *Gunlock v. Environmental Landscape, LLC*, No. 22cv95405 (Warren Cty., Ohio CP).  (Doc. 72 at PageID 3662.)  The issue is whether Kirkland's attempted interference caused Gunlock to end his relationship with Defendants.

The timeline of events is revealing.  Gunlock made an initial deposit payment to Defendants for $200,000 in November 2021, and he expected that he might have to make additional progress payments.  (Gunlock Dep., Doc. 72 at PageID 3655.)  Defendants performed services on Gunlock's property from November 2021 through May 2022.  (*Id.* at PageID 3662–

3663.)  Gunlock testified that his dispute with Defendants began by January 2021 and that

Defendants knew they "had a really dissatisfied client very early on."  (*Id.* at PageID 3661–3662,

3672.)  He was upset that Defendants planted smaller trees on his property than he and

Defendants had agreed to.  (*Id.* at PageID 3672.)  Gunlock also testified that he was concerned

about the health of the trees that Defendants planted as early as March or April 2021.  (*Id.* at

PageID 3671–3672.)  He added that it was apparent by May or June 2021 that some trees

Defendants had planted were dead.  (*Id.*)  Gunlock refused to pay an invoice for $448,969.94 in

May 2022 and an invoice for $250,000 in June 2022 because he had "paid them the 200,000-

dollar deposit, but not received 200,000 dollars' worth of product and services."  (*Id.* at PageID

3662, 3671.)  In sum, the evidence shows that Gunlock was unhappy with Defendants because he

was disappointed in the size and health of the trees Defendants planted and that he stopped

paying invoices to Defendants before Kirkland requested him to do so on June 21, 2022.  The

evidence does not prove that Kirkland procured a breach of the contract or relationship between

Gunlock and the Defendants.  Defendants' tortious interference claim fails as a matter of law.

The Court will grant summary judgment to Kirkland and deny summary judgment to

Defendants on Defendants' tortious interference counterclaim.

### 5.    Counterclaim Six—Fraudulent Inducement

Defendants allege in Counterclaim Six that Kirkland is liable for fraud in the amount of

$223,217.45—the amount listed as due by Kirkland in the August 29, 2022 Statement.  (Doc. 10

at PageID 305–307.)  They allege that Kirkland misrepresented her intention to buy or secure an

easement for the Phillips parcel of land to obtain a lower bid and contract price from Defendants.

(*Id.* at PageID 306.)  They also allege that Kirkland misrepresented her intent to pay Defendants

for the work they performed.  (*Id.* at PageID 306–307.)  Kirkland moves for summary judgment

on this counterclaim.

To succeed on this counterclaim, Defendants must prove that Kirkland made a false representation about a fact material to their contracts; knew the statement was false or utterly disregarded whether it was true or false; and intended to induce Defendants to rely on the representation. *See Micrel*, 486 F.3d at 874. Defendants also must prove that they relied on the misrepresentation and were injured by their reliance. *Id.*

### a. Phillips Parcel

As to the first sub-counterclaim, Kirkland argues that she did not make a false representation because she intended to buy the Phillips parcel and that Defendants cannot prove damages even if she made a false representation. Kirkland sought to purchase or secure an easement to the Phillips parcel at their existing driveway to make it easier to access the work site area on top of Kirkland's steep Property. Sanders testified on behalf of ELL that Kirkland told him before they signed any contracts that "she was buying part of the neighbor's property so it would be easier to get up and down the site." (Doc. 67 at PageID 3440.) Kirkland had, in fact, reached out to her neighbors, the Phillips, before July 14, 2021 about buying a 20-foot parcel of their lower entrance/driveway. (Doc 76-3 at PageID 3892.) She also offered to pay for the Phillips to reconstruct their driveway at a different location on their property. (*Id.*) On September 13, 2021, less than one month before the parties entered into the Phase One Proposal, Alex Phillips sent an email telling Kirkland they needed a break from projects and would not agree to move their driveway at that time:

> In regards to the driveway, I'm completely on board with moving the driveway. After discussing with Liv we still think the ideal spot for the new driveway is where that blue garage is. However, we honestly need a break from house projects at the moment. We'd be open to this plan in the future, but right now we would like to keep things as-is. Can we circle back on this down the road, when we're ready to undertake the garage demolition?

(*Id.* at PageID 3894.)  The Phillips's refusal to move their driveway meant that Kirkland could not buy their parcel.

Defendants argue that the Phillips's September 13, 2021 email is proof that Kirkland knew before the parties entered into their contracts in October and November 2021 that she would be unable to secure the Phillips's parcel.  They argue that she continued to tell Defendants that she would obtain the Phillips parcel to induce Defendants to submit a lower bid on the projects.  Kirkland refutes this.  She asserts that the Phillips's September 13, 2021 merely represented a delay in her plan to buy the parcel.

Kirkland emailed Alex Phillips on February 28, 2022 stating her belief that the Phillips had agreed to her plan:

> From prior discussions, it seemed we were in agreement with relocating both of our driveways at my expense. In my opinion, it will make a dramatic improvement to the aesthetics of our properties.
>
> * * * *
>
> Attached are illustrations for your reference as well as the proposed entrance gate piers. Once approved by you and Liv, I would like your specific input as to how you would like your entrance to appear and the layout of your driveway. All construction will be at my cost including any landscaping you would like at your entrance, including piers to your specification if desired. Construction of your new entrance would proceed [*sic*] mine as to immediately give you privacy from my construction.

(*Id.* at PageID 3896.)  Kirkland's basis for believing that the Phillips would sell her the parcel in a timely manner during the pendency of the projects on her Property is unclear.  As of April 2024, Kirkland had not bought or secured an easement to the Phillips parcel.  (Doc. 49-11 at PageID 2031.)  The Court finds that there is a question of fact whether Kirkland knew she did not have the Phillips's agreement or whether she acted with a disregard for the truth when she told Sanders she would secure the Phillips parcel to make accessing the work site of the Property easier.

As to damages for this first subclaim, Sanders testified on behalf of ELL that Defendants incurred damages from the misrepresentation separate from damages owing on the contracts. (Doc. 67 at PageID 3440–3441.)  He had difficulty, however, estimating the amount of damages suffered:

> I'm not sure of the exact dollar thing.  I mean, I guess we could hire some financial wizard and they can tell us what it is. I don't know what the dollar figure is.

(*Id.* at PageID 3441.)  He ultimately estimated that the increased costs from being unable to access the Property work site from the Phillips parcel was probably $35,000 to $40,000, but he could not provide a basis for that figure other than his years of experience.  (*Id.* at PageID 3441–3442.)  He testified generally that they had to install a temporary driveway—which Kirkland asserted without contradiction that she paid for—and needing to use extra equipment on top of the hill to pull other equipment up the hill.  (*Id.* at PageID 3441; Kirkland Decl., Doc. 83 at PageID 3964.)  Likewise, Braddock testified that she knew that Kirkland had told Sanders that Kirkland would get an easement to soften the entrance to her hillside Property, and Braddock factored in the ease of access to the property when she prepared project proposals.  (Doc. 49-7 at PageID 1818–1819; Doc. 53 at PageID 2580.)  Although it presents a close question, the Court is satisfied that Sanders created at least a dispute of fact that it suffered extra-contractual damages of approximately $35,000 based on Kirkland's misstatement about the Phillips parcel.  The Court will deny summary judgment to Kirkland on the Phillips parcel subclaim.

### b.    Intent to Pay

Defendants' second fraud subclaim is based on the allegation that Kirkland falsely stated that she would pay Defendants for services rendered that she never intended to pay.  Defendants offer no evidence that Kirkland intended not to pay other than that she did not, in fact, pay all sums invoiced by Defendants.  (Doc. 77 at PageID 3921–3922.)  She did pay more than

$500,000.  Again, a fraudulent inducement claim must be based on more than simply an unfulfilled promise.  *See Michael J. Cavill 2012 Irrevocable Tr.*, 2018 WL 4690792, at *4.  The Court will grant summary judgment to Kirkland on Defendants' fraudulent inducement subclaim based on the intent to pay.

### 6.  Counterclaims Seven and Eight—Conversion and Civil Theft

In Counterclaim Seven, Defendants allege that Kirkland is liable for conversion because she kept possession of $11,495.16 worth of materials that ELL purchased to use on the Property and that she did not pay for.  (Doc. 10 at PageID 307.)  Similarly, in Counterclaim Eight, Defendants allege that Kirkland is liable under Ohio Revised Code § 2307.60 for civil theft based on Kirkland's conversion of its materials.  (*Id.* at PageID 308.)  "[T]he elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages."  *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 700 (S.D. Ohio 2012).  To recover for conversion of property, the plaintiff must establish that he demanded a return of the property and that the defendant refused to return it.  *Id.*  As for civil theft, Ohio Revised Code § 2307.60(A)(1) "creates a statutory cause of action for damages resulting from any criminal act . . . unless a civil action is specifically excepted by law."  *Jacobson v. Kaforey*, 2016-Ohio-8434, 149 Ohio St. 3d 398, 400 (2016) (cleaned up).[10]

Kirkland moves for summary judgment on both counterclaims on the basis that they

---

[10] Ohio Revised Code § 2307.60 provides:

> (A)(1) Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

Ohio Rev. Code Ann. § 2307.60.

overlap the breach of contract counterclaims based on the failure to pay time and material charges. "A conversion claim cannot be based upon property rights that arise entirely from contractual rights." *Highman v. Gulfport Energy Corp.*, No. 2:20-cv-1056, 2020 WL 6204344, at *4 (S.D. Ohio Oct. 22, 2020); *see also Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292, 2011 WL 2181813, at *18 (S.D. Ohio June 3, 2011) ("[C]laims for conversion cannot ordinarily be predicated on a refusal to pay funds owed under a contract."), *aff'd,* 731 F.3d 608 (6th Cir. 2013). Likewise, Ohio courts have held that no civil action for theft exists if the theft is based on a breach of contract. *STE Invs.*, 2022-Ohio-2614, ¶ 42 (Ohio App. 6th Dist. 2022); *Wildcat Drilling, LLC v. Discovery Oil and Gas, LLC*, 2018-Ohio-4015, 121 N.E.3d 65, 72 (Ohio App. 7th Dist. 2018), *rev'd and remanded on other grounds,* 164 Ohio St.3d 480, 2020-Ohio-6821, 173 N.E.3d 1156. This is true because "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Pham Constr.*, 236 N.E.3d at 857.

Sanders testified on behalf of ELL that Defendants still had materials on the Property when Kirkland fired them and told them not to return to the property. (Doc. 67 at PageID 3443–3444.) He testified that Defendants did not "get the chance" to ask Kirkland to return the materials because Kirkland "hid behind her lawyer" after she fired them. (*Id.* at PageID 3444.) He could not specifically identify what the materials were, other than to describe them as "building materials and [ ] trees, shrubs and anything we left up there." (*Id.* at PageID 3443.) As explained earlier, there is a dispute of fact whether any of time and material charges could be considered a part of any of the four written contacts. If time and material charges were not contractual, then Defendants could pursue damages for the unpaid materials via the conversion and civil theft claims. The Court will deny summary judgment to Kirkland on the conversion and civil theft claims because material facts remain disputed. Defendants will not be entitled to

receive damages for the same time and material charges under more than one theory of recovery.

**7. Summary**

The Court will grant in part and deny in part Kirkland's Motion for Summary Judgment on the counterclaims and deny Defendants' Motion for Partial Summary Judgment on the counterclaims. The Court will grant summary judgment to Kirkland only on two defamation sub-counterclaims, the tortious interference counterclaim, and one fraud subclaim.

## IV. CONCLUSION

For the reasons stated above, Defendants' Amended Motion for Partial Summary Judgment (Doc. 56) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is denied to Defendants on Kirkland's Sixth Claim for unjust enrichment to the extent it is based on the time, material, and management and overhead charges in Invoices #2498 and #2512. Summary judgment is granted to Defendants on Kirkland's Seventh, Eighth, and Ninth Claims for professional negligence and fraudulent inducement.

Additionally, Kirkland's Motion for Partial Summary Judgment as to Defendants' Counterclaims (Doc. 69) is **GRANTED IN PART AND DENIED IN PART** and Defendants' Motion for Partial Summary Judgment on their Fourth and Fifth Counterclaims (Doc. 70) is **DENIED**. Summary judgment is denied to Kirkland on Defendants' Counterclaims One and Two for breach of contract and action on account. Summary judgment is denied to Kirkland on Defendants' Counterclaim Three for unjust enrichment. Summary judgment is granted to Kirkland on the "con man" and "crook" subclaims and on the Dyer statements subclaim in Defendants' Counterclaim Four for defamation. Summary judgment is denied to Kirkland on the Phillips email subclaim and to Defendants on all subclaims in Defendants' Counterclaim Four for defamation. Summary judgment is granted to Kirkland and denied to Defendants on

Defendants' Counterclaim Five for tortious interference.  Summary judgment is denied to

Kirkland on the Phillips parcel subclaim and granted to Kirkland on the intent to pay subclaim in

Defendants' Counterclaim Six for fraud.  Summary judgment is denied to Kirkland on

Defendants' Counterclaims Seven and Eight for conversion and civil theft.

This case will proceed to trial on April 7, 2025.

**IT IS SO ORDERED.**

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Judge